1   Alan E. Wisotsky (SBN 68051)
    Jeffrey Held (SBN 106991)
2   LAW OFFICES OF ALAN E. WISOTSKY
    300 Esplanade Drive, Suite 1500
3   Oxnard, California  93036
    Tel:   (805) 278-0920
4   Fax:   (805) 278-0289
    E-mail:  lawyers@wisotskylaw.com
5
    Attorneys for Defendants CITY OF SANTA
6   PAULA, SANTA PAULA POLICE
    DEPARTMENT, STEVE MacKINNON, RYAN
7   SMITH, CODY MADISON, and CARLOS MITRE

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11  MAX VILLANUEVA VASQUEZ, an )      No. CV 09-02590 DSF (MANx)
    individual,                )
12                             )      **DEFENDANTS' MEMORANDUM**
              Plaintiff,        )      **OF CONTENTIONS OF FACT**
13                             )      **AND LAW PURSUANT TO**
         v.                     )      **CENTRAL DISTRICT LOCAL**
14                             )      **RULE 16-4 AND STANDING**
    THE CITY OF SANTA PAULA,    )      **ORDER I.D.2**
15  et al.,                     )
                               )      PTC  :  May 3, 2010
16            Defendants.       )      Time :  3:00 p.m.
                               )      Place:  840 Roybal
17                             )
                               )      Trial:  June 29, 2010
18                             )      Time :  8:00 a.m.
                               )      Place:  840 Roybal
19                             )
    _____)
20

21         In accordance with Central District Local Rule 16-4.1 and Judge Fischer's

22  Standing Order re Jury Trial I.D.2, defendants hereby submit the following

23  memorandum of contentions of fact and law.

24                              **I.**

25        **SUMMARY STATEMENT OF PLAINTIFF'S CLAIMS**

26         Plaintiff claims that Santa Paula police officers Madison and Mitre used exces-

27  sive force against him at about 8:10 p.m. on Sunday, April 15, 2007, in violation of

28  his Fourth Amendment rights under 42 U.S.C. §1983.  He claims that Ryan Smith,

                              1

who arrived at the conclusion of the incident, frightened and intimidated him by having his police dog close by, barking at him.  Plaintiff further claims that the municipality engaged in a deliberately indifferent custom, practice, and policy violative of his federally protected rights under *Monell* and its progeny.  There are no other federal counts, such as false arrest.  There are no state-law causes of action.

## II.

## ELEMENTS OF A DOMESTIC VIOLENCE-TASER CASE

The correct analysis of a Taser plaintiff's §1983 cause of action against police officers is contained in a quite recent Ninth Circuit decision, *Mattos v. Agarano*, 590 F.3d 1082 (9th Cir. 2010).  That case, as this, involved police responding to a domestic violence call for service and ultimately utilizing a Taser stun to disable a suspect.  In *Mattos*, as here, minimal Taser use was involved (one five-second cycle there, two five-second cycles here).  In both cases, minimal injury resulted to the plaintiff.  In both cases, profane curses were screamed at the police while the plaintiff was physically resisting arrest, short of striking the police.  The only differentiating feature is that in the instant case, the plaintiff had blood on his arms from knocking out his vehicle windshield in fury at the mother of his child for perceived infidelity.  The officers were concerned with the presence of the blood, whose source they did not know.

The *Mattos* court stated that there is a three-step process which must be used to analyze force cases.  Step one is to evaluate the gravity of the particular intrusion on the Fourth Amendment interests by analyzing the amount and type of force inflicted.  At this stage of the analysis, plaintiff should offer evidence about the kind of force and injury a Taser inflicts and the severity of any injuries suffered from the Taser.  The instant plaintiff suffered no Taser injury and has disclosed no expert witness.

/ / /

2

1    At step two, the jury analyzes the importance of the government interests at
2    stake.  This depends upon three sub-components.  These are the severity of the crime
3    involved, whether the suspect posed an immediate threat to the safety of the officers
4    or others, and whether the suspect was actively resisting apprehension or attempting
5    to evade arrest by flight.  At this stage, sub-component No. 2 comprehends that

6    We view the officers' safety as the most important of the
7    three *Graham* factors.

8    *Mattos*, 590 F.3d at 1088.

9    Further, sub-component No. 1 includes recognition that

10    Given the dangerous nature of domestic violence situations,
11    . . . we recognize that in responding to a domestic violence
12    call, the officers confronted a dangerous and volatile
13    situation.

14    *Id*. at 1088-1089.

15    Police are required by law to thoroughly investigate reports of domestic
16    violence.  The responding officers must interview the people involved, determine
17    whether probable cause exists to make an arrest, arrest any involved individual as to
18    whom probable cause exists to believe that domestic violence was committed, and
19    protect the reported victims of domestic violence. *Mattos v. Agarano*, 590 F.3d 1082,
20    1088-1089 (9th Cir. 2010); *Balistreri v. Pacifica Police Department*, 901 F.2d 696,
21    700-701 (9th Cir. 1990); *Navarro v. Block*, 72 F.3d 712, 715 (9th Cir. 1996); Cal.
22    Penal Code §137.01(a) and (b).

23    As to the third sub-component,

24    Although there may have been alternative methods of
25    forcefully moving Jayzel out of the way, officers are not
26    required to use the least amount of force necessary. . . .
27    Although an alternative method of force may have been
28    advisable, the Fourth Amendment does not require an

3

1          officer to use the minimum amount of force necessary to

2          move Jayzel and arrest Troy.

3    *Id*.

4          The third step of the analysis requires the jury to weigh the two quantities

5    measured in steps one and two.  This step weighs the gravity of the intrusion against

6    the government's interest in order to ascertain whether the force used was

7    constitutionally reasonable.  In striking the balance, the jury views the weighing

8    process through the prism of the admonition that

9          The reasonableness of a particular use of force must

10         be judged from the perspective of a reasonable officer on

11         the scene, rather than with the 20/20 vision of hindsight. . . .

12         Police officers are often forced to make split-second

13         judgments — in circumstances that are tense, uncertain, and

14         rapidly evolving — about the amount of force that is

15         necessary in a particular situation.

16   *Mattos*, 590 F.3d at 1088.

17   **III.**

18   **SUMMARY STATEMENT OF COUNTERCLAIMS**

19   **AND AFFIRMATIVE DEFENSES**

20         There are none.

21   **IV.**

22   **ELEMENTS REQUIRED TO ESTABLISH DEFEN-**

23   **DANT'S COUNTERCLAIMS AND AFFIRMATIVE**

24   **DEFENSES**

25         Not applicable.

26   / / /

27   / / /

28   / / /

4

## V.

## DESCRIPTION OF KEY EVIDENCE RELIED UPON IN SUPPORT OF EACH COUNTERCLAIM AND AFFIRMATIVE DEFENSE

Inapplicable.

## VI.

## IDENTIFICATION OF ANY ANTICIPATED EVIDENTIARY ISSUES

Defendants defer to their 18 motions in limine.  These are summarized in the proposed order granting the 18 in limine motions, which contains brief descriptions of the subject matter sought to be excluded by each of them.

## VII.

## IDENTIFICATION OF ISSUES OF LAW GERMANE TO THE CASE

Other than the issues explored in defendants' in limine motions and raised by the jury instructions (most importantly, defendants' proposed Special Instruction Nos. 20-27, whose source authorities are therein annotated), there are no uniquely dispositive legal issues in this case.

## VIII.

## BIFURCATION OF ISSUES

Defendants have requested in their first motion in limine, and repeat here, that the district court enter an order trifurcating the trial into three phases.  Phase one would address the narrow issue of whether there was a constitutional violation or not — that is, whether there was an unreasonable seizure under the Fourth Amendment. The second phase, if necessary, would address damages, both compensatory and punitive.  The third phase, if necessary, would address the *Monell* or policymaker issues.

///

The phasing of federal civil rights trials is by now well-recognized and common practice. *Quintanilla v. City of Downey*, 84 F.3d 353, 356-357 (9th Cir. 1996); *Amato v. City of Saratoga Springs*, 170 F.3d 311, 320 (2d Cir. 1999) ["Our holding today is informed, in part, by the frequent bifurcation of proceedings where a plaintiff has initiated a §1983 action against individual officials and municipal entities"].

There are three justifications for bifurcating or trifurcating civil rights trials. The first is judicial economy. If the jury determines that there was no underlying constitutional violation — that is, no unreasonable search or seizure — a great deal of the Court's time, as well as that of the witnesses and parties, is saved by the ability not to present argument and evidence on other issues. If there is no underlying constitutional violation, there is no need for further trial determinations. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

Second, a non-phased civil rights trial opens every door to otherwise wholly inadmissible character evidence. If the entity liability phase were combined with the liability of the individual defendant officers, there would be extreme prejudice to the defendant officers as the jury heard reams of testimony about other officers' uses of force and even these officers' uses of force on other occasions. It would take on the dimensions, in the mind of the trier of fact, of an endless cacophony of violence by these officers and this department, when those issues are wholly extraneous to a §1983 case. Those other instances are inadmissible character evidence. *Duran v. City of Maywood*, 221 F.3d 1127, 1132-1133 (9th Cir. 2000); *Gates v. Rivera*, 993 F.2d 697, 700 (9th Cir. 1993); *United States v. Geston*, 299 F.3d 1130, 1137-1139 (9th Cir. 2002) [although not a §1983 case, affirming in limine exclusion of other violent acts of the defendant as impermissible character evidence].

The third reason involves the very different culpability levels in a search and seizure case — reasonableness — versus a *Monell* case — objective deliberate indifference. Bifurcation or trifurcation is favored because of the tremendously complex *Monell* formulation. As the entity liability elements have evolved from

1   *Monell* and its progeny, it is now a confusing multi-element test.  The entity liability

2   formulation asks the jury to determine whether a policymaking official promulgated,

3   ratified, or adopted an objectively deliberately indifferent custom, practice, or policy

4   which proximately caused the deprivation of the plaintiff's federally protected

5   constitutional or statutory rights.  *McDade v. West, supra,* 223 F.2d at 1141-1142.

6                              **IX.**

7                    **STATEMENT OF FACTS**

8        On a Sunday evening at 8:00, April Clanton placed a call for service to the

9   Santa Paula Police Department.  She reported that the plaintiff had thrown her against

10  a wall and then slammed a gate on her arm.  Senior Officer Cody Madison and Officer

11  Carlos Mitre were dispatched on an expedited basis.   Officer Madison found

12  Ms. Clanton, plaintiff's unmarried cohabitant, crying hysterically.  She told him that

13  the man who was walking rapidly away from them was her ex-boyfriend.  Moments

14  later, Ms. Clanton told Officer Mitre that "He does not want to give my baby back;

15  help my baby."  She was still crying hysterically while holding her elbow in a guarded

16  position, as though it were injured.

17       Senior Officer Madison saw bloody cuts on the plaintiff's arms as the plaintiff

18  was banging heavily on the front door of the home, demanding entry.  The testimony

19  of April Clanton fully confirms that Mr. Vasquez was furiously angry that evening.

20  He had come to her place of employment and made a scene, accusing her of having

21  an affair with one of the waiters at the restaurant where she worked.  She left work

22  and went home to bring some tranquility to the situation with her boyfriend.  She

23  found the windshield of one of his cars knocked out.  Mr. Vasquez told her that he did

24  that himself.  In his report and on tape, Officer Madison documents the existence and

25  importance of blood on Mr. Vasquez's arms.

26       Mr. Vasquez said that he was trying to enter his mother's house, but Officer

27  Madison had no way of knowing the truth or falsity of that statement.  He asked the

28  plaintiff some questions:  what was going on, who the woman in the front yard was,

1   why she was so upset, and why he was cut and bleeding.  The plaintiff said that he did

2   not know who she was, that the officer should ask her why she was so upset, that

3   nothing was going on, and that he was bleeding because he cut himself on his vehicle.

4   In his deposition, the plaintiff admitted that he lied to the officer about not knowing

5   the identity of Ms. Clanton, why she was upset, and not knowing what was going on.

6       The person in the house, Jennifer Jump, was babysitting the daughter of April

7   Clanton and Max Vasquez at the request of Mr. Vasquez's mother.  Ms. Jump did not

8   open the door, even though Mr. Vasquez was banging on it heavily.  She claims that

9   she did not open the door because it was a complicated lock and she could not figure

10  out how to unlock it.  It is a reasonable inference that she, who had been in that house

11  on other occasions, did know how to open the front door but was frightened of

12  Mr. Vasquez, who was furiously angry and had blood on his arms.

13      Police officers investigating domestic violence cases have a very difficult job.

14  *Mattos*, 590 F.3d at 1088-1089.  Anger is running high, because these are deeply

15  personal issues which brought the police there.  These are dangerous and volatile calls.

16  *Mattos, id.*

17      The Ninth Circuit, in *Ballistreri* and *Navarro*, and the Penal Code, in Section

18  13701, compel officers to conduct full interviews of all participants in a domestic

19  violence call, to stop all domestic violence, to ascertain the existence or absence of

20  probable cause to make an arrest, and to make an arrest of preferably only one suspect

21  if there is probable cause to believe that he or she has committed a crime.  The

22  attempted home entry by Mr. Vasquez greatly complicated the situation — an officer

23  would be a great fool to let the subject of a domestic violence call, with bloody hands,

24  who is belligerent, lying, and uncommunicative, enter a residence.  Once inside, he

25  could obtain access to weapons or accomplices, barricade himself, or even take and

26  injure hostages.

27  / / /

28      Officer Madison instructed Mr. Vasquez several times to have a seat on the

1  front porch before he would finally do so.  There is nothing degrading or harmful
2  about sitting down.

3      But as soon as Senior Officer Madison walked away a short distance to
4  interview Ms. Clanton, Mr. Vasquez immediately stood up as Officer Mitre took over.
5  The plaintiff was furiously angry, as proven by his nonstop barrage of screamed curse
6  words.  It is a reasonable inference that he was tempted by the replacement of the
7  larger officer, Madison, 5'11", 240, with the much smaller officer, Mitre, 5'5", 160,
8  to stand up.  Mr. Vasquez had to stand up to pull up his falling-down pants and to spit,
9  he testified.

10     Officer Mitre reinstructed the plaintiff to be seated during the investigation, but
11 instead the 6'1" plaintiff felt bold against the diminutive officer.  The plaintiff stood
12 and began walking toward the front door of the home again.  Officer Mitre could not
13 let Mr. Vasquez enter the home, so he clasped plaintiff's left wrist with a standard
14 police control hold called a wrist lock.

15     But Mr. Vasquez took it upon himself to spin hard away from Officer Mitre's
16 wrist lock.  Being much smaller than the plaintiff, about seven inches shorter, Officer
17 Mitre could not control him.  Mr. Vasquez whirled away and collided with the garage,
18 creating a minor eyebrow laceration.

19     Officer Mitre tried the wrist lock again, but again the plaintiff pulled hard away.
20 When Officer Mitre then grabbed for plaintiff's shirt collar, Mr. Vasquez grabbed
21 Officer Mitre's right wrist with his left hand, breaking the officer's grasp.

22     Officer Mitre then instructed Mr. Vasquez several times to get on the ground,
23 which he would not do.  Seeing his smaller partner losing the struggle, Officer
24 Madison broke off his interview of April Clanton and ran to help Officer Mitre.  Due
25 to Mr. Vasquez's size, physical resistance, unwillingness to cooperate with the simple
26 instruction to be seated, belligerent mental state, and bloody forearms, Officer
27 / / /
28 Madison fired his Taser into plaintiff's left rib cage.  He activated the full five-second

9

1  cycle.

2      The plaintiff fell to the ground.  Officer Madison yelled at the plaintiff to put

3  his hands behind his back, but he would not do so.  So after evaluating the situation

4  for eight seconds, Officer Madison activated a second cycle of five seconds of the

5  Taser.  Then Mr. Vasquez did cooperate and place his hands behind his back.  Officer

6  Mitre could then see that Mr. Vasquez was not holding a weapon and he could

7  handcuff Mr. Vasquez, which he did.

8      Paramedics were staged nearby and were then able to treat the plaintiff and

9  transport him to a nearby hospital.  There, Dr. Eric Davey found no significant injury,

10  with the exception of a small cut along his eyebrow.  He successfully sealed the cut

11  with Dermabond, an integumentary adhesive.

12      The plaintiff claims that he was never resisting the officers and used no force

13  of his own.  He claims not to have pulled away, spun out of their grasp, or wrestled

14  against them.  But if the plaintiff was not resisting, why is his mother audio- recorded

15  as screaming, "Max, lay over.  Max, lay on the ground now!  Lay still.  Be quiet."

16  Police-recorded events are presumptively definitive accounts.  *Scott v. Harris*,

17  550 U.S. 372, 380-381 (2007).

18      The best summation of this case is to quote the post-incident conversation

19  recorded by Senior Officer Madison between Mr. Vasquez and himself.

20          Madison:  Dude, you've got to listen to what we're

21          telling you.

22          Vasquez:  I'm sorry, man.  I didn't mean to do this.

23      I did not try to fuck with you guys.  I'm sorry.

24          Madison:  You've just got to talk with us.  I know

25          you're all heated up, but you've got to relax, buddy.

26          Vasquez:  Okay, that's cool.

27  / / /

28          Madison:  You know, we show up and you've got

10

blood on you.  I don't know if there's a dead body in there
or what's going on.

## X.

## <u>DEFENDANTS WHO SHOULD BE DISMISSED</u>

Defendants will move, at trial, for the dismissal of defendants City of Santa Paula, Santa Paula Police Department, Chief Steve MacKinnon, and Sgt. Ryan Smith. The municipality and its police department did not promulgate, ratify, or adopt any deliberately indifferent custom, practice, or policy proximately leading to the deprivation of plaintiff's federally protected rights.  This multi-element formulation is stringent, requires a conscious decision by a policymaker to violate civil rights, and is necessary to prevent §1983 liability from collapsing into mere respondeat superior liability.  *Board of County Commissioners v. Brown*, 520 U.S. 397, 404-405, 415 (1997); *McDade v. West*, 223 F.3d 1135, 1141-1142 (9th Cir. 2000); *Ortez v. Washington County*, 88 F.3d 804, 811 (9th Cir. 1996); *Villegas v. Gilroy*, 541 F.3d 950, 957 (9th Cir. 2008).  There is no such policy or practice.

Chief MacKinnon was not present during the events in question, nor did he communicate with or advise the responding personnel.  He is an unnecessary, supernumerary party entitled to dismissal under *Kentucky v. Graham*, 473 U.S. 159, 167 (1985), and *Luke v. Abbott*, 954 F.Supp. 202, 203 (C.D. Cal. 1997).

Ryan Smith arrived after all force had already been deployed.  The incident was fully concluded.  As an officer who was present but uninvolved in any use of force, he too is not liable, as a matter of law.  *Liston v. County of Riverside*, 120 F.3d 965, 981 (9th Cir. 1997), and *McDade v. West*, 223 F.3d at 1142.

Plaintiff disputes Sgt. Smith's claim that the police dog, Rex, was in the police car the entire time that plaintiff was present and never left the car.  Plaintiff says that Rex came very close and barked loudly at him.  Even if true, which it is not, non-contact verbal events between law enforcement officers and citizens are not §1983 actionable.  *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987); *Collins v.*

1   *Cundy*, 603 F.2d 825, 827 (10th Cir. 1979); *Pittsley v. Warish*, 927 F.2d 3, 7 (1st Cir.

2   1991).  Therefore, Sgt. Smith ought to be exonerated, as a matter of law.

3

4         Dated:  April _____, 2010

5                                                    LAW OFFICES OF ALAN E. WISOTSKY

6

7                                          By:_____

8                                              JEFFREY HELD
                                               Attorneys for Defendants, CITY OF
9                                              SANTA PAULA, SANTA PAULA
                                               POLICE DEPARTMENT, STEVE
10                                             MacKINNON, CARLOS MITRE,
                                               CODY MADISON, and RYAN SMITH

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28