BRIAN A. VOGEL, SBN 167493
THE LAW OFFICES OF BRIAN A. VOGEL, PC
770 County Square Dr., Ste. 104
Ventura, CA 93003
Phone: (805) 654-0400
FAX: (805) 654-0326
EMAIL: brian@bvogel.com

Attorney for Plaintiff
MAX VILLANUEVA VASQUEZ

## UNITED STATED DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAX VILLANUEVA VASQUEZ, an individual ) | CASE NO. CV09-02590 (DSF-MAN) |
| ) | |
| Plaintiff, ) | **PLAINTIFF'S MOTION IN LIMINE** |
| ) | **NO. 3 TO EXCLUDE IMPROPER** |
| ) | **EXPERT OPINIONS AND OPINIONS** |
| -vs- ) | **ON THE ULTIMATE ISSUES TO BE** |
| ) | **DECIDED BY THE JURY.** |
| THE CITY OF SANTA PAULA, THE SANTA ) | |
| PAULA POLICE DEPARTMENT, POLICE ) | |
| CHIEF STEVE MACKINNON, OFFICER ) | |
| CARLOS MITRE, OFFICER CODY MADISON, ) | .Date: May 3, 2010 |
| OFFICER RYAN SMITH in both their individual ) | Time: 3:00 p.m. |
| and official capacities, and DOES 1-10, inclusive. ) | Ctrm: 840 Roybal |
| ) | |
| ) | |
| Defendants. ) | |
| ) | |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at the pretrial conference on May 3, 2010, plaintiff will

move the Honorable Dale S. Fischer, United States District Judge, for an order in limine

1

excluding the introduction of any improper expert opinions from Defendants' expert Greg Meyer. This motion is made under Fed. R. Ev. 401, 402, 403, 702 and 703.

In accordance with Judge Fischer's Standing Order re Jury Trial, II.A, and Central District Local Rule 7-3, the parties, through counsel, Brian A. Vogel and Jeffrey Held, conducted their pre-filing conference relating to this and all of Plaintiff's motions in limine telephonically on March 23 and April 8, 2010.  On March 23, 2010, Plaintiff conveyed the nature and subject matter of his proposed five Motions in limine and he later  electronically transmitted the exact text of the motions to defendant's counsel.  On April 8, 2010, Plaintiff and Defense counsel met and conferred again telephonically and while agreement was reached on several issues, both parties agreed that precise identification of those areas of agreement could best be accomplished by filing statements of nonopposition.

## I. THE COURT MAY EXCLUDE AN EXPERT'S OPINION WHERE IT IS BASED  UPON SPECULATION. CONJECTURE AND/OR IMPROPER MATTERS.

F.R.E. 702 limits an expert opinion to those subjects that are beyond the competence of persons of common experience, training and education. See *Beech v. Aircraft Corp*. V. U.S., 51 F.3d 834, 841-42 (9th Cir. 1995) (trial court had discretion to exclude an expert opinion regarding what was contained on an inaudible tape recording, because the subject matter was not beyond the expertise of the jury); *U.S. v. Langford*, 802 F.2d 1176, 1179-90 (9th Cir. 1986) (trial court did not abuse its discretion by excluding proposed expert testimony regarding the reliability of eyewitnesses, on the basis that the opinion would not assist the jury.)  As a general principle, expert opinions may be excluded when they are based upon improper matter and are not shown to be reliable. *Daubert v. Merrel Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993) (trial court

faced with proposed scientific testimony or evidence must ensure that the evidence is relevant and reliable.) An expert may not base his or her opinion on speculation or conjecture. See *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1422-23 (9th Cir. 1998) (experts were properly excluded as unreliable when their opinions represented unsupported and untested conclusions); *Gray v. Shell Oil Co.*, 469, F.2d 742, 749-50 (9th Cir. 1972 (expert's opinion that was speculative and not supported by the evidence, was properly excluded.) Furthermore, expert opinions that are based upon inadmissible hearsay may be excluded.

Most importantly, experts may not usurp the function of the court or the jury by interpreting the meaning of legal standards or opining on the ultimate issues to be decided by the jury.   As Defendants pointed out in their MOTION IN LIMINE NO. 9, "[expert] testimony remains objectionable if it communicates an explicit or even an implicit legal standard to the trier of fact. Whereas an expert may be uniquely qualified by experience to assist the trier of fact, he is not qualified to compete with the judge in the function of instructing the jury." *Hygh v. Jacobs*, 961 F.2d 359, 363-364 (2d Cir. 1992).  Similarly, expert opinions may not usurp the function of the jury by rendering an opinion on the ultimate issues to be decided by the jury. Here again, as Defendants pointed out in their MOTION IN LIMINE NO. 9, *Reynolds v. County of San Diego*, 84 F.3d 1162, 1170 (9th Cir. 1996) disallowed proffered testimony a police tactics expert that the officer used reckless tactics to restrain the decedent. If allowable, such testimony would have created a genuine issue of material fact regarding the reasonableness of the officer's use of deadly force. But the Ninth Circuit held that the proffered testimony was to be disregarded. The fact that a police practices expert disagrees with an officer's actions does not render the officer's actions unreasonable. The Ninth Circuit stated that the inquiry is not whether another reasonable or more reasonable interpretation of events can be constructed after the fact.

1   *Id.* at 1170.

2       The following opinions of Defendants' expert, Greg Meyer, as expressed in his expert

3   report attached hereto as Exhibit "1" are pure legal conclusions masquerading as opinions.  The

4   

5   "opinions" use the language of the jury instructions or relevant caselaw and, unsurprisingly,

6   conclude, in effect, that the jury should decide in favor of the Defendants.  These opinions  usurp

7   the function of both the judge and jury, and are exactly the type of opinion on an ultimate issue

8   which are prescribed the Federal Rules of Evidence.

9       **P.6, Opinion no. 2 - "Officer Madison's detention of Mr. Vasquez was lawful."**

10

11      OBJECTIONS - Improper expert opinion on an ultimate issue, Legal conclusion, and

12  Speculative to the extent that it does not take into account Plaintiff's version of events.

13      **P.8, Opinion no. 4 - "Sufficient probable cause existed for Officer Mitre to arrest**

14  **Mr. Vasquez and take him into custody."**

15

16      OBJECTIONS - Improper expert opinion on an ultimate issue, Legal conclusion, and

17  Speculative to the extent that it does not take into account Plaintiff's version of events.

18      **P. 8, Opinion no. 5 - "The physical force used by Officer Mitre was within SPPD**

19  **policy and guidelines, was objectively reasonable, and did not constitute excessive force."**

20

21      OBJECTIONS - Improper expert opinion on an ultimate issue, Legal conclusion, and

22  Speculative to the extent that it does not take into account Plaintiff's version of events.

23      **P. 9, Opinion no. 6 - "The lack of a TASER warning to Mr. Vasquez was reasonable**

24  **in this case."**

25      OBJECTIONS - Improper expert opinion on an ultimate issue, Legal conclusion, and

26  Speculative to the extent that it does not take into account Plaintiff's version of events.

27      **P. 10, Opinion no. 7 - Officer Madison's first use of the TASER X26 (first**

28

4

activation) was within SPPD guidelines, was objectively reasonable, and did not constitute excessive force."

OBJECTIONS - Improper expert opinion on an ultimate issue, Legal conclusion, and Speculative to the extent that it does not take into account Plaintiff's version of events.

**P. 11, Opinion no. 8 - Officer Madison's second TASER activation was within SPPD guidelines, was objectively reasonable, and did not constitute excessive force."**

OBJECTIONS - Improper expert opinion on an ultimate issue, Legal conclusion, and Speculative to the extent that it does not take into account Plaintiff's version of events.

**P. 16, Opinion no. 15 - My review of of SPPD policies, personnel records and internal affairs records of the involved officer, and documents pertaining to this incident led me to conclude that there is no evidence of unaddressed officer misbehavior or agency deficties that constitute "deliberate indifference" regarding the agency customs and practices with respect to personnel training, discipline or supervision.**

OBJECTIONS - Improper expert opinion on an ultimate issue, Legal conclusion.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court exclude the introduction of the improper "opinions" of Defendants' expert set forth above.

DATED: April 12, 2010                    THE LAW OFFICES OF BRIAN A. VOGEL, PC


By:      _Brian Vogel_
         Brian A. Vogel
         Attorney for Plaintiff
         Max Villanueva Vasquez

# EXHIBIT 1

VASQUEZ VS. CITY OF SANTA PAULA, ET AL.

CV 09-02590 DSF (MANx)

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

REPORT OF DEFENSE EXPERT GREG MEYER

Vasquez v. Santa Paula, et al                                                          2
Report of Defense Expert Greg Meyer

My opinions are based upon:

1. My review of documents reviewed thus far in the Vasquez v. City of Santa Paula case (listed below on page 17);
2. my personal knowledge, skill, education, training and experience as a researcher, policy drafter, user, trainer, reviewer, and consultant on law enforcement procedure issues;
3. 34 years of law enforcement experience as a sworn police officer, detective, sergeant, lieutenant, and captain, and reserve officer;
4. training and experience I received in the course of my duties as a Los Angeles Police Department officer and a Long Beach Police Department officer;
5. additional knowledge and/or training I have obtained, particularly from the Police Executive Research Forum (PERF), the International Association of Chiefs of Police (IACP), Americans for Effective Law Enforcement (AELE), the Force Science Research Center (FSRC), the Institute for Prevention of In-Custody Death (IPICD), and the American Society for Law Enforcement Training (ASLET);
6. specific experience with respect to the investigation, administrative review and adjudication at the supervisory and command levels for police use of force incidents and internal affairs investigations and adjudications for both;
7. prior and ongoing work as an expert witness on police procedures and policy, training, equipment, tactics, supervision and review processes, in federal, state, and local courts, both civil and criminal;
8. frequent attendance as a lecturer or participant in use-of-force conferences that focus on Conducted Energy Devices, especially the TASER device.
9. my personal experience as a long-time instructor and user of various TASER devices;
10. my personal experience as a Police Captain at the Los Angeles Police Academy, in charge of tactical training, including TASER training;
11. my service on the California POST review committee for its electronic control weapons training DVD.

## LIMITATIONS

I am informed that I may be asked to review a number of documents or items of evidence in this case that have not yet been presented. Should those items or other relevant information become available to me subsequent to the submission of this report, I would expect to offer more opinions or modify reported opinions as appropriate.

Vasquez v. Santa Paula, et al                                                                                                3
Report of Defense Expert Greg Meyer

### INCIDENT SUMMARY

On Sunday, April 15, 2007, at 20:01 hours Ms. April Clanton called the Santa Paula Police Department (SPPD) and reported that Mr. Vasquez (father of her child) had *threw her up against a wall and slammed a gate into her* (Clanton*'s) arm…and was refusing to return the child.*[1]

At 2004 hours Officer Madison, Officer Smith and Officer Mitre, were dispatch to the *domestic violence* call. Officer Madison arrived and saw Ms. Clanton crying hysterically next to her car. Mr. Vasquez was walking rapidly away toward a residence. Mr. Vasquez approached the front door of 759 Fillmore Street and began to bang on the door; Officer Madison broadcast a request for expedited response of additional officer(s). Officer Madison contacted Mr. Vasquez and questioned him but he was uncooperative. Officer Madison *noticed small lacerations on Vasquez's forearms and blood on them.* Officer Madison ordered Mr. Vasquez several items to sit down after which he finally complied. Officer Madison asked Mr. Vasquez *what was going on and he said "nothing".* Mr. Vasquez *said he was bleeding because he had damaged his own vehicle.* Mr. Vasquez said he *did not know* why the woman was upset out front.[2]

Officer Mitre arrived on scene soon after hearing Officer Madison's broadcast. Upon Officer Mitre's arrival, he saw Ms. Clanton *standing next to her white 2004 Toyota Corolla, California license plate #5GBB096.* Ms. Clanton was *crying hysterically holding her elbow yelling, "Help my baby; he (Mr. Vasquez) does not want to give my baby back."* [3]

Officer Mitre saw Officer Madison with Mr. Vasquez who was sitting on the floor at the door of 759 Fillmore Street, Santa Paula. Upon Officer Mitre's arrival, Officer Madison asked Officer Mitre to stay with Mr. Vasquez; Officer Madison then walked away *to speak with Clanton* while Officer Mitre remained with Mr. Mr. Vasquez.[4]

While Officer Mitre was alone with Mr. Vasquez, he (Mr. Vasquez) stood up and began to walk away towards the front door of the residence. Officer Mitre grabbed Mr. Vasquez' left wrist with an *academy type control hold* [described telephonically by Officer Mitre to me as a rear-wristlock].[5] *Officer Mitre tried to put Mr. Vasquez on the floor.* Mr. Vasquez tried to pull away from Officer Mitre. He spun around and attempted to *get away from* Officer Mitre. Officer Mitre then grabbed Mr. Vasquez' shirt from the front with his (Officer Mitre's) right hand while ordering Mr. Vasquez to the ground several times.[6]

Officer Madison heard Officer Mitre ordering Mr. Vasquez to sit down, then saw Officer Mitre grab Mr. Vasquez' left wrist as he was trying to leave. Officer Madison articulated that *due to the suspect's actions of appearing to attempt to flee the scene, his untruthfulness, the injuries on his forearms which I was unable to confirm the source, and continued resistance to Ofcr Mitre*

---

[1] SPPD Call for Service Record P2
[2] SPPD Police Report – Officer Madison P1
[3] SPPD Police Report – Officer Mitre P1
[4] SPPD Police Report – Officer Madison P1
[5] My telephonic with Officer Mitre on 2-9-2010
[6] SPPD Police Report-Officer Mitre P1

Vasquez v. Santa Paula, et al                                                    4
Report of Defense Expert Greg Meyer

*he [Madison] removed his Taser from the holster…[and from an estimated distance of 3-4']*[7] *fired the Taser ( one five second cycle) into the left torso/rib area of Mr. Vasquez.  Mr. Vasquez immediately stiffened up and fell to the ground.*[8]

According to Officer Mitre, prior to firing the Taser, Officer Madison yelled, *Taser Taser Taser.*[9]/[10]  The Taser darts struck Mr. Vasquez in the left side torso.  Officer Mitre then tried to grab Mr. Vasquez' left hand.  Mr. Vasquez continued to resist.  Officer Mitre and Officer Madison told Mr. Vasquez to place his hands behind his back and Mr. Vasquez refused to comply.

Officer Madison applied a second five (5) second cycle, articulating that he feared that Mr. Vasquez *may have a weapon* and because of Mr. Vasquez' resistance and his refusal to comply.[11]  After the second and last activation, Mr. Vasquez complied and put both hands behind his back, however, was *verbally abusive to officers.*[12]  Officer Mitre requested EMS for Mr. Vasquez and Ms. Clanton's injuries.  <u>Mr. Vasquez subsequently apologized to Officer Madison and Officer Mitre *for his actions,*</u>[13] stating <u>*"I wasn't trying to fight you, dude.  I'm sorry, man.  I didn't mean to do this.  I didn't try to fuck with you guys.  I'm sorry."*</u>[14]  Mr. Vasquez was treated at scene by paramedics/EMS.  He was subsequently transported to Santa Paula Hospital for a medical clearance to be booked.

Mr. Vasquez received a laceration to his eye brow due to falling during the initial Taser deployment.  Other injuries were documented as follows:

- Forearms – from vandalizing his own vehicle (per Mr. Vasquez' statement)[16]
- Elbows – received from struggling with officers
- Bruising around neck-received *from Officer Mitre when Mr. Vasquez was up against the garage door.*[17]

---

[7] My in-person interview with Officer Madison on 2-9-2010, during which he estimated the TASER probe spread to be approximately 6", thus I estimate the distance at 3-4' per my TASER training and experience.
[8] SPPD Police Report-Officer Madison P2
[9] SPPD Police Report – Officer Mitre P1
[10] In the transcript or the audio recording Bates Stamp 1038, Officer Madison is heard to state *"Sorry I didn't say taser, I know…Oh, I didn't say taser."* During my 2-9-2010 telephonic with Officer Mitre his recollection was that he wrote that Officer Madison gave the TASER warning because Officer Mitre thought that Officer Madison had said it.  Human memories are imperfect.  It is uncertain what role previous training sessions in which the "Taser, Taser, Taser" warning may have played in this matter, and the issue remains unresolved.  It seems more likely to me that Officer Madison's contemporaneous statement that he did not give the warning is more accurate than Officer Mitre's report written later at the station.
[11] SPPD Police Report – Officer Madison P2
[12] SPPD Police Report – Officer Madison P2
[13] SPPD Police Report – Officer Madison P2
[14] Transcript of tape recording, Bates Stamp 1035
[16] SPPD Police Report – Officer Madison P1
[17] SPPD Police Report – Officer Madison P2

Vasquez v. Santa Paula, et al                                          5
Report of Defense Expert Greg Meyer

Officer Mitre read Mr. Vasquez his Miranda Rights and he declined to make a statement.
Photographs were taken of Mr. Vasquez' injuries. A portion of the incident (the second
activation) was recorded by Officer Madison's personal recording device. The recorder appears
to have been activated after the first TASER activation and before the second activation.[18]

## ANALYSIS AND OPINIONS

Officer Madison, Officer Mitre and Officer Smith responded to a <u>Domestic Violence call with
the information provided by dispatch that a male suspect, identified as Mr. Vasquez, *threw* the
victim *against a wall* and *slammed a gate onto her* (Ms. Clayton's) arm.</u> Officer Madison, first
on scene <u>observed Ms Clayton "hysterical"</u> by her car in front of the location of occurrence.
Upon Officer Madison's arrival, <u>Mr. Vasquez walked "rapidly" away from Ms. Clayton toward a
house.</u> Officer Madison <u>attempted to question Mr. Vasquez, but he was uncooperative.</u> <u>Officer
Madison noticed small lacerations and blood on Mr. Vasquez' forearms.</u> Officer Madison
ordered him to sit (which Mr. Vasquez did).

### Opinion No. 1:
**Domestic violence calls present police officers with significant dangers
and sensitivities, and police are required by law to take such calls
seriously, and to make arrests when there is probable cause.**

Nationwide in 2008, the Federal Bureau of Investigation (FBI) reported in its annual Law
Enforcement Officers Killed and Assaulted (LEOKA) report that 58,792 officers were
assaulted while performing their duties. The largest percentage (32 percent) were
assaulted while responding to "disturbance calls," which includes family disputes among
other types of disturbances.[19]

Also, in the recent *Mattos* case[20], the 9th Circuit Court of Appeals highlighted the dangers
of domestic violence calls:

> We have observed that "[t]he volatility of situations involving
> domestic violence" makes them particularly dangerous. *United
> States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir.2005) "When
> officers respond to a domestic abuse call, they understand that
> violence may be lurking and explode with little warning. Indeed,
> more officers are killed or injured on domestic violence calls
> than on any other type of call." *Id.* (internal citations and
> quotation marks omitted); *see also* *United States v. Black*, 482
> F.3d 1035, 1040 (9th Cir.2007) ("Our circuit has recognized that
> the exigencies of domestic abuse cases present dangers that ....
> may override considerations of privacy.") (internal citations
> omitted).

---

[18] Tape recording at Bates Stamp 1026; and transcript of the tape, Bates Stamp 1027
[19] From http://www.fbi.gov/ucr/killed/2008/summary_leoka.html
[20] *Mattos v. Agarano*, 2010 WL 92478 (9th Cir.(Hawai'i))

Vasquez v. Santa Paula, et al                                                    6
Report of Defense Expert Greg Meyer

The Penal Code (PC) of California requires law enforcement officers to take domestic
violence calls seriously, as per this excerpt:

**California Penal Code Section 13701**

```
(a) Every law enforcement agency in this state shall
develop, adopt, and implement written policies and standards for
officers' responses to domestic violence calls by January 1, 1986.
These policies shall reflect that domestic violence is alleged
criminal conduct.  Further, they shall reflect existing policy that a
request for assistance in a situation involving domestic violence is
the same as any other request for assistance where violence has
occurred.
     (b) The written policies shall encourage the arrest of domestic
violence offenders if there is probable cause that an offense has
been committed.
```

Also, I am aware of two 9th Circuit Court of Appeals rulings in domestic violence cases
(the *Navarro* and *Balistreri* cases[21]) that provide that the equal-protection requirements of
the United States Constitution require police officers to respond appropriately to such
calls and take them seriously.

## Opinion No. 2:
## Officer Madison's detention of Mr. Vasquez was lawful.

Peace officers may detain persons who are believed to be involved in criminal activity.  A
reasonable law enforcement officer, faced with the circumstances as they existed at the
time…would believe that criminal activity was (or had been, or was about to be) afoot.
*See Terry v. Ohio*, 392 U.S. 1 (1968).  Officer Madison was responding to a crime-in-
progress call where the police dispatcher had provided sufficient information to support
reasonable suspicion for officers to detain Mr. Vasquez.  Upon arrival, Officer Madison
saw Mr. Vasquez leaving a hysterically crying Ms. Clanton, the apparent victim of a
crime. Officer Madison had a duty to take action to detain Mr. Vasquez (the probable
suspect in the crime), who was attempting to leave and gain entry to a house. Officer
Madison observed blood on Mr. Vasquez' forearms.  Officer Madison reasonably
attempted to control Mr. Vasquez (a potential felony suspect) with verbalization, by
ordering him to sit down; after which, Mr. Vasquez complied.  The combination of the
crying woman, Mr. Vasquez' attempt to flee and gain entry into a house, and the
observation of the blood on Mr. Vasquez forearms gave Officer Madison more than
enough reasonable cause to detain Mr. Vasquez and investigate what was happening.

Officer Mitre arrived soon after and contacted Officer Madison who asked Officer Mitre to
"watch" (i.e., continue to detain) Mr. Vasquez while Officer Madison spoke with Ms. Clayton to
investigate the crime.  As Officer Madison left, Mr. Vasquez stood up and began to leave toward
the house again.  Officer Mitre demanded Mr. Vasquez sit down and Mr. Vasquez refused.

---

[21] *Navarro v. Block*, 72 F.3d 712 (9th Cir. 1995); and *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696 (9th Cir. 1990)

<u>Officer Mitre then used an objectively reasonable level of physical force to detain Mr. Vasquez</u>
<u>as follows</u>:

      1.  Grab to left wrist (attempt to apply a hold)
      2.  Attempted take down, intending to take Mr. Vasquez to the ground
      3.  Grab to shirt, attempting to take Mr. Vasquez to the ground

## Opinion No. 3:

**It was tactically important for the safety of the officers, Mr. Vasquez,
and anyone who might have been inside the house for officers to prevent
Mr. Vasquez from entering the uncontrolled environment of the house.**

It is universally recognized among police tactics instructors that it is a serious error to
allow an uncontrolled subject into an uncontrolled environment during an investigation. It
is also universally recognized within the police profession that domestic violence calls
rate among the most dangerous types of calls an officer must deal with.  It would have
been a serious tactical error for the officers to allow Mr. Vasquez to enter the house under
the circumstances of this incident.  The officers were there to investigate a report of
domestic violence.  Mr. Vasquez was not controlled and searched.  There was no way at
that time to know whether Mr. Vasquez had a right to enter the house.  Had he entered
the house, there was no way to know at that time who or what might be behind the door
(guns, knives, other weapons, friends who might come to his aid in his efforts to elude
the police, innocent victims who might become hostages, or any of a number of other
foreseeable negative outcomes).  There are hundreds, perhaps thousands, of police
officers dead in their graves because they made tactical mistakes of this nature.

Nationwide in 2008, the Federal Bureau of Investigation (FBI) reported in its annual Law
Enforcement Officers Killed and Assaulted (LEOKA) report that 58,792 officers were
assaulted while performing their duties.  The largest percentage (32 percent) were
assaulted while responding to "disturbance calls," which includes family disputes among
other types of disturbances.[22]

As a specific example of the risks and dangers of a domestic violence incident, I offer the
following:

> Ventura County Sheriff's Deputy Peter John Aguirre, Jr. was shot and killed while
> investigating a family disturbance with three other deputies. After the wife exited the
> house, Deputy Aguirre entered to talk to the husband.  The suspect shot and killed
> Deputy Aguirre inside the home and then ran outside naked with two guns and
> engaged the other three deputies in a shootout. . . . Deputy Aguirre, who did not even
> have time to draw his weapon, died of multiple gunshot wounds to the body and head.

---

[22] From http://www.fbi.gov/ucr/killed/2008/summary_leoka.html

Vasquez v. Santa Paula, et al.
Report of Defense Expert Greg Meyer

8

. . . Deputy Aguirre had served with the agency for 2 years.  He is survived by his wife and daughter.[23]

## Opinion No. 4:
**Sufficient probable cause existed for Officer Mitre to arrest Mr. Vasquez and take him into custody.**

## Opinion No. 5:
**The physical force used by Officer Mitre was within SPPD policy and guidelines, was objectively reasonable, and did not constitute excessive force.**

Mr. Vasquez was reported to be 6'2" and 180 pounds.[24]  Officer Mitre was reported to be approximately 5'6" and of slight build.[25]

Section 835(a) of the California Penal Code allows police officers to use force to make an arrest, overcome resistance, and prevent escape.  In addition, officers may use force to defend themselves or another person from harm.  Here, Mr. Vasquez attempted to leave the site of a legal detention.  Officer Mitre attempted to stop him first with command presence and verbalization.  Mr. Vasquez's actions fell within the *Moderate* to *Aggressive Resistance* category of the SPPD use of force continuum (continuum).  When he refused to comply, Officer Mitre's used that physical force which was reasonable to attempt to overcome Mr. Vasquez' resistance, and it was consistent with the SPPD's use of force continuum as a *Physical control technique.*[26]

While Officer Mitre's report did not articulate the specific rationale for the use of force, it is apparent that he was attempting to take Mr. Vasquez into custody for a violation of PC 148(a)(1) resist, obstruct, delay a peace officer (PC148).  There was sufficient reasonable suspicion for Mr. Vasquez' detention for Domestic Violence and no reasonable person would have been under the impression that they were free to leave.  When Mr. Vasquez attempted to leave when ordered to remain seated, officers had adequate probable cause to arrest him for PC148.  There was also probable cause to arrest him for PC 273.5 Domestic Violence based upon the information received from the police dispatch operator after Ms. Clanton called the police, combined with her observable injury.[27]

Moreover, the United States Supreme Court has established that police use of force must be objectively reasonable. The Court stated that the calculus of reasonableness in a police use of force incident must embody allowance for the fact that police officers are often

---

[23] From  http://www.odmp.org/officer/14778-deputy-sheriff-peter-john-aguirre-jr.
[24] SPPD domestic violence report SF0701319, P1
[25] My interview with Officer Madison on 2-9-2010
[26] SPPD General Order 8-3, Use of Less Lethal Force, Bates Stamp 3223
[27] Community Memorial Hospital Discharge Instructions re the contusion to April Clanton

Vasquez v. Santa Paula, et al                                                                                    9
Report of Defense Expert Greg Meyer

forced to make split-second judgments in circumstances that are tense, uncertain, and
rapidly evolving about the amount of force that is necessary in a particular situation; that
the test of reasonableness is not capable of precise definition or mechanical application;
and that the reasonableness of a use of force incident must be judged from the perspective
of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.[28]

The force used by Officer Mitre was objectively reasonable to overcome Mr. Vasquez'
resistance, and was consistent with law and SPPD policy. Any officer of similar training
and experience, faced with similar facts and circumstances would have reasonably relied
on physical force to control the suspect and effect his arrest.

> Note: Plaintiff's allegations included Mr. Vasquez being *kicked*; however, Mr.
> Vasquez in his deposition actually denies being kicked.[29]

Officer Madison observed the above actions and responded to assist Officer Mitre. He saw that
Mr. Vasquez failed to comply with Officer Mitre's verbalization, and he saw that Officer Mitre
was not being successful at overcoming Mr. Vasquez' resistance by applying physical force.
Officer Madison deployed his X26 TASER; firing the TASER darts into Mr. Vasquez' left torso,
and applied a standard five-second cycle. The TASER deployment was initially effective, and
Mr. Vasquez *stiffened up and fell to the ground.*[30]

## Opinion No. 6:
## The lack of a TASER warning to Mr. Vasquez was reasonable in this case.

Earlier discussion on page 4 of this report (above) concerned the whether or not Officer
Madison stated "Taser, Taser, Taser" prior to discharging the TASER device at Mr.
Vasquez. However, that particular warning, as worded per TASER training, is for the
benefit of other *officers* at the scene, so they know that a TASER is being used, not a
firearm.

Agency policies and the courts are more concerned with whether or not the *resisting
subject* (Mr. Vasquez, in this case) receives a warning that a TASER will be utilized if he
does not submit to lawful arrest. Often there is an opportunity to warn the subject when
time and distance are on the side of the officer, such as in a stand-off situation while
verbalization is being employed to encourage the subject to submit to lawful arrest. The
SPPD policy states, *"When circumstances allow, the deploying officer shall announce the
intention of activating the Taser (and/or sparking the Taser) so other officers on scene
know it is going to be activated. This may also gain compliance from subjects whom the
Taser is being activated against."[31]*

---

[28] See Graham v. Connor, 490 U.S. 386 (1989)
[29] Mr. Vasquez Deposition transcript P17
[30] SPPD Police Report – Officer Madison P2
[31] SPPD General Order 8-8, Use of an Electronic Control Device (Taser), P2, Bates Stamp 3085

Vasquez v. Santa Paula, et al                                                    10
Report of Defense Expert Greg Meyer

However, circumstances in this case did not provide an opportunity for warning Mr. Vasquez that the TASER was about to be used. This was not a stand-off situation with time and distance on the side of the officers while they engaged in verbalization to encourage Mr. Vasquez to peacefully submit to lawful arrest. Rather, Mr. Vasquez and Officer Mitre were already physically engaged as Officer Mitre attempted to overcome Mr. Vasquez' resistance, and it was tactically important to end the altercation as soon as possible.

## Opinion No. 7:
**Officer Madison's first use of the TASER X26 (first activation) was within SPPD policy and guidelines, was objectively reasonable, and did not constitute excessive force.**

Officer Madison saw Mr. Vasquez actively resisting Officer Mitre's attempt to take Mr. Vasquez into custody; and saw him attempt to flee. He saw that Officer Mitre's efforts to control Mr. Vasquez were not successful. Officer Madison assisted by using that force which he believed to be reasonable to stop Mr. Vasquez' resistance and effect his arrest. The standard five-second TASER cycle was an objectively reasonable attempt to stop Mr. Vasquez' resistance and in fact was effective.

This use of the TASER was consistent with SPPD policies and guidelines[32] as well as best practices and national guidelines. No facts were present that would preclude the use of the TASER (e.g. at-risk populations, danger of falling from a high place, danger of drowning, flammable/explosive material nearby, etc.).

Ultimately, any officer of similar training and experience, faced with similar facts and circumstances would have reasonably relied on the TASER to control the suspect in order to take him into custody after physical force failed to be effective. Additionally, this force option was consistent with SPPD policy.[33]

> Note: Plaintiff's complaint alleged that Mr. Vasquez became unconscious and involuntarily urinated as a result of the TASER use. In more than 30 years of TASER experience around the country I have never known a person to become unconscious from being exposed to the TASER. I have also never known of a case of involuntary urination during a TASER use, although TASER training mentions it as a rare occurrence. When I separately asked both Officer Madison and Officer Mitre if they were aware of Mr. Vasquez becoming unconscious or involuntarily urinating during the incident, they stated that they were not.[34] In

---

[32] SPPD General Order 8-8, Use of an Electronic Control Device (Taser), Bates Stamp 3084
[33] SPPD General Orders 8-3, Bates Stamp 3223
[34] My interview with Officer Madison and my telephonic with Officer Mitre, both on 2-9-2010

addition, I find no evidence on the audio tape recording or the transcript of the recording that indicates that either of these things occurred.[35]

At the conclusion of the initial five-second TASER cycle, Officer Madison assessed and evaluated Mr. Vasquez' reactions.[36]  The period between the end of the first TASER cycle and the beginning of the second TASER cycle was eight seconds.[37]  Mr. Vasquez continued to refuse to comply with officer's orders *to place his hands behind his back* (i.e., demand to submit to arrest).  Officer Madison articulated that Mr. Vasquez *may have a weapon*; and in consideration of his refusing to comply with officer's orders, Officer Madison decided to apply a second standard five-second TASER cycle with the objective of gaining Mr. Vasquez' compliance and his submission to arrest.  In reaction to the second cycle, Mr. Vasquez complied with orders to place his hands behind his back and did submit to arrest, precluding the use of further force.  The use of the TASER was effective and prevented an escalation of force that likely would have been more injurious to Mr. Vasquez and potentially the officers themselves.  (Further discussion of injury potential will appear later in this report.)

> Note: This case involves an allegation that the first Taser activation occurring while Mr. Vasquez was *handcuffed*.  However, Mr. Vasquez in his deposition denies this occurred and states that he recalls being partially cuffed with one handcuff at the time of the second activation.[38]

> Note: In the audio recording in this incident, Officer Madison is heard to state,"…Get your other hand back there before you get it again." This confirms that the second and final activation occurred before Mr. Vasquez was handcuffed.

## Opinion No. 8:
## Officer Madison's second TASER activation was within SPPD policy, was objectively reasonable, and did not constitute excessive force.

The second deployment of the TASER for a standard five-second activation was within SPPD policy and objectively reasonable due to Mr. Vasquez's continued resistance and refusal to comply with officers' orders while they were attempting to take him into custody.  Contrary to plaintiff's assertion, there is no evidence that either of the TASER activations occurred while Mr. Vasquez was handcuffed.

Consistent with national best practices and TASER guidelines, the second cycle was applied to prevent injury to the suspect (Mr. Vasquez) or to officers, which may have resulted with escalated, more injurious force options (baton or other impact devices, for example) and was only used after Officer Madison assessed the circumstances.  Consequently, the use of the TASER was a reasonable force option for Officer Madison;

---

[35] Tape recording at Bates Stamp 1026; and transcript of the tape, Bates Stamp 1027
[36] My interview with Officer Madison on 2-9-2010
[37] Taser download printout, Bates Stamp 3007; see my Opinion No. 13, below
[38] Mr. Vasquez Deposition transcript P22

Vasquez v. Santa Paula, et al                                                          12
Report of Defense Expert Greg Meyer

and the second and final activation was objectively reasonable based on the totality of the circumstances. Any officer of similar training and experience, faced with similar facts and circumstances would have reasonably utilized a second TASER activation to control Mr. Vasquez in order to take him into custody, after physical force and an initial activation of the TASER both failed to be effective. Ultimately, the second activation was effective in controlling Mr. Vasquez without serious injury to officers or Mr. Vasquez, and it effectively ended the incident.

> Note: During my interview with Officer Madison, I estimated that he initially deployed the TASER probes from a distance of approximately 3-4 feet, based upon his estimate that the probes were located approximately six inches apart on Mr. Vasquez.[39] Although the optimal range of the TASER is 7-15 feet, the use of the Taser at 3-4 feet was objectively reasonable because of the need to quickly stop the resistance; it was consistent with training, which teaches three feet as the minimum distance that will typically be effective; and it worked well in this case.

## Opinion No 9:
**Officer Madison was trained in the use of force, SPPD policy and guidelines, and the use of the TASER x26.**

As are all California peace officers, Officer Madison had state-mandated use-of-force training while he was in basic officer training at a police academy in 1998. Officer Madison completed a Taser Certification course and exam on June 6, 2006 and was certified to carry the Taser X26. He also completed a total of four Force Options Simulator (use of force) trainings which meets California POST *Perishable Skills* Training mandates. The last simulator use of force training session was completed on February 16, 2007, two months before the incident occurred.[40]

## Opinion No 10:
**Officer Mitre was trained in the use of force, SPPD policy and guidelines, and the use of the TASER x26.**

As are all California peace officers, Officer Mitre had state-mandated use-of-force training while he was in basic officer training at a police academy in 1998. Officer Mitre completed a Taser Certification course and exam on May 29, 2006 and was certified to carry the Taser X26. He also completed Force Options Simulator (use of force) training which meets California POST *Perishable Skills* Training on June 19, 2006, ten months before the incident occurred.[41]

---

[39] My interview of Officer Madison on 2-9-2010.
[40] Training records for Officer Madison, Bates Stamp 3058, etc.
[41] Training records for Officer Mitre, Bates Stamp 3037, etc.

Vasquez v. Santa Paula, et al                                                              13
Report of Defense Expert Greg Meyer

Opinion No. 11:
The TASER X-26 is a generally effective, generally safer alternative to
other types of force and use of the TASER is supported by national best
practices.

There is a plethora of documentation in the form of court decisions and research studies
that show that TASER produces fewer and less severe injuries to subjects and officers,
compared to conventional tools and tactics, especially when dealing with a determined,
resisting subject as was the case in this incident.

One of those studies is my own master's thesis, an internationally recognized study
(appended as EXHIBIT NO. 1) that shows that TASER deployment on a resisting
suspect typically results in fewer and less severe injuries to officers and suspects,
compared to other nonlethal police tools and tactics (including batons, kicks, punches,
flashlights, the "swarm" technique, and miscellaneous bodily force such as ground-
fighting, grappling, tackling, and other hands-on tactics).

A major National Institute of Justice (NIJ) funded TASER safety study was completed in
October 2007 (see EXHIBIT NO. 2). In 962 field incidents that occurred in six cities,
99.7% involved no serious injury from the TASER. Quoting from the press release
announcing the completion of the study:

> "This study is the first large, independent study of injuries associated with Tasers.
> It is the first injury epidemiology study to review every Taser deployment and to
> reliably assess the overall risk and severity of injuries in real world conditions,"
> said William Bozeman, M.D., the lead investigator and an emergency medicine
> specialist at Wake Forest University School of Medicine. "The injury rate is low
> and most injuries appear to be minor. These results support the safety of the
> devices." . . .

The independent prospective study was funded by the National Institute of Justice and
included six law enforcement agencies across the United States. A tactical physician at
each participating agency reviewed police and medical records after each successful
application of a Taser.

A 2007 article entitled, "The impact of conducted energy devices and other types of force
and resistance on officer and suspect injuries," published in "Policing: An International
Journal of Police Strategies & Management" (see EXHIBIT NO. 3) reported a study that
analyzed 1,645 use-of-force incidents involving conducted energy weapons (CEDs) and
pepper spray from two law enforcement agencies. The article abstract reported:

> The analysis suggests that relative to other forms of force, the use of CEDs and
> pepper spray can reduce the risk of injury to both suspects and law enforcement
> officers. This information should prove useful to law enforcement agencies

Vasquez v. Santa Paula, et al                                                                   14
Report of Defense Expert Greg Meyer

considering adopting CEDs and suggests that agencies should consider the use of these less lethal alternatives in place of hands-on tactics against actively resistant suspects.

A photograph of a TASER X-26 is presented for reference (see **EXHIBIT 4**). There are popular misconceptions about the amount of electrical power that TASERs deliver (see **EXHIBIT NO. 5**). The TASER X-26 is powered by two Duracell 3-volt camera batteries (see **EXHIBIT NO. 6**), thus it is incapable of delivering large amounts of power. Of the 50,000 volts that are created by the device, the peak voltage delivered to the body is 1,200 volts. The power is delivered through a series of pulses lasting 100 microseconds (millionths of a second) each. Automated External Defibrillator (AED) research has determined that 200 joules of electricity is "relatively low energy" and "is safe." The TASER X-26 delivers .07 joules per pulse, which is more than 2,800 times less energy.

The Police Executive Research Forum (PERF), a renowned national police research and leadership organization, has published *Conducted Energy Device* (CED) *Policy and Training Guidelines* (as well as a glossary of terms) with respect to the TASER device (see **EXHIBIT 7**).

The following PERF guideline excerpts are applicable to this case and Officer Madison's deployments of the TASER:

1.    *CEDs should only be used against persons who are actively resisting or exhibiting active aggression, or to prevent individuals from harming themselves or others. CEDs should not be used against a passive suspect.*

The facts and evidence in this case support that Mr. Vasquez was actively resisting and attempting to flee and the use of the TASER prevented further injury.

2.    *When activating a CED, law enforcement officers should use it for one standard cycle and stop to evaluate the situation.*

According to all statements and the evidence, Officer Madison's actions were consistent with this guideline.

18.    *Agencies should create stand-alone policies and training curriculum for CEDs and all less-lethal weapons, and ensure that they are integrated with the department's overall use-of-force policy.*

SPPD General Orders (policy and procedures) are consistent with PERF guidelines.

Vasquez v. Santa Paula, et al                                                    15
Report of Defense Expert Greg Meyer

Additionally, the International Association of Chiefs of Police (IACP) in its Electronic
Control Weapons (ECW) Model Policy, section C, para. 1 (see **EXHIBIT 8**), states:

> *The ECW is generally analogous to oleoresin capsicum (OC) spray on the use-of-force continuum, and decisions to use an ECW involve the same basic justification.*

## Opinion No. 12:
**The SPPD has in place specific written procedural guidelines in the form of General Orders which effectively address the deployment and use of Electronic Control Devices and which are consistent with national and industry best practices aforementioned.**[42]

Those guidelines and Officer Madison's deployment of the TASER are consistent with the SPPD's use of force policy contained within General Order, 8-8 and 14-2, specifically:

- Mr. Vasquez was displaying active/aggressive resistance.
- No more than two activations were used.
- Probe mode was used instead of Drive Stun mode.
- Second activation was used when first failed to control the suspect.
- Officer Madison assessed the effectiveness of the first activation before considering the second activation, which occurred eight seconds later.
- Photographs were taken of the injuries.
- A supervisor was notified timely to the incident and reviewed and approved Officer Madison's use of force report.

## Opinion No.13:
**Officer Madison activated the TASER for only two, standard five-second cycles, with an eight-second gap between the two cycles.**

The two TASER activations in this incident are confirmed by the TASER download printout[43], indicating that activations #362 and #363 (which review of the printout shows were the only activations pertinent to this incident) were both standard five-second activations with an eight-second gap between the two as follows:

Activation 1 - #362    4/15/2007, local time 19:49:28 to :33, duration 5 seconds
Activation 2 - #363    4/15/2007, local time 19:49:41 to: 46, duration 5 seconds

Note:  The internal computer chip of the TASER X-26 records the time at the *end* of each activation.  "Local times" on TASER download printouts rarely coincide

---

[42] SPPD General Order 8-8, Use of an Electronic Control Device (Taser), Bates Stamp 3084
[43] Taser download printout, Bates Stamp 3007

Vasquez v. Santa Paula, et al                                                          16
Report of Defense Expert Greg Meyer

> with real time, as most agencies do not regularly synchronize the TASER internal
> clocks with a real-time source; and there is a "time drift" from month to month on
> the internal clock, as is typical with such technology.

## Opinion No.14:
**Officer Smith had no obligation to intervene and stop unlawful conduct
because none was occurring, and because he was not at the scene until
the end of the incident.**

The plaintiff alleged that Officer Smith should have intervened to stop unlawful conduct
(excessive force) by other personnel. While it is true that officers have an affirmative
duty to do so, and are trained to do so, there was no reason for such intervention in this
case. The force used by both Officer Mitre and Officer Madison was objectively
reasonable, not excessive, as explained in my above opinions. There is no evidence that
Officer Smith was present until the end of the incident, and he specifically told me that he
did not arrive until after it was over.[44]

## Opinion No.15:
**My review of SPPD policies, personnel records and internal affairs
records of the involved officers, and documents pertaining to this
incident led me to conclude that there is no evidence of unaddressed
officer misbehavior or agency deficiencies that constitute "deliberate
indifference" regarding the agency customs and practices with respect
to personnel training, discipline, or supervision.**

I reviewed the personnel files and internal affairs files for Officers Madison, Mitre, and
Smith.[45] Each of them received numerous written commendations from members of the
public regarding their performance in various field incidents. Each of them was rated
"meets standards" or "exceeds standards" or "excellent" for each of the evaluation
criteria in the rating reports. The evaluations were thorough and objective. My training
and experience causes me to conclude that the SPPD employee evaluation system is
outstanding.

I noted that the internal affairs investigation files reflected systematic and thorough
investigations, adjudication, and letters from Chief of Police McKinnon to complaining
citizens announcing that an investigation had commenced as well as letters from Chief of
Police McKinnon announcing to complaining citizens and the accused officers the
outcomes of the investigations. Based upon my training and experience, these
investigations were completed in a high-quality manner, and in a manner sensitive to the
complainants.

---

[44] My interview with Officer Smith (now Sergeant Smith) on 2-9-2010
[45] Bates Stamp 3422-3928

Vasquez v. Santa Paula, et al                                                    17
Report of Defense Expert Greg Meyer

> **Note:** One complaint that occurred in 2009 is apparently still in the investigative process. Only the documentation of the initiation of the citizen complaint appeared in file. This does not appear to be unusual in any way.

The case of Officer Mitre's records tends to prove my opinion. Officer Mitre experienced several policy violations while he was a SPPD officer, including a written warnings regarding pursuit policy and time management. His evaluations by supervisors also documented report-writing deficiencies as well as improvements on past performance. His evaluations by supervisors and correspondence from Chief of Police McKinnon himself documented these deficiencies and provided improvement expectations. On one occasion, Chief of Police McKinnon issued Mitre a memo of concern arising out of adjudication of a complaint, pointing the way toward how Mitre could do better in the future to avoid such complaints, even though the complaint itself was not sustained against Mitre.

Taken as a whole, the tone set by Chief of Police McKinnon and his supervision staff causes me to conclude that SPPD takes personnel matters seriously and addresses them competently. There is no evidence whatsoever that SPPD is lax in its personnel practices, or is deliberately indifferent to the needs at any level while providing professional police service.

## DOCUMENTS REVIEWED

The following documents assisted my review of this case:

1. Plaintiff's claim for damages and related court filings, such as answers, responses and requests for production
2. Santa Paula Police Department reports including arrest and follow up reports and Use of Force Report
3. Santa Paula Police Department Calls for Service Record
4. Santa Paula Police Department Taser Logs
5. Tape recording and transcript of tape recording of Vasquez Incident
6. TASER download printout
7. Training and certification documents for involved officers
8. Santa Paula Police Department General Orders
9. TASER International Training materials
10. California POST Training records for Officers Mitre and Madison
11. Printout copies of color photographs
12. Santa Paula Police Department TASER purchase documents
13. Deposition Transcript of Max V. Vasquez, dated October 2, 2009

14. Deposition Transcript of Jennifer Jump, dated October 6, 2009

15. Deposition Transcript of April Clanton, dated October 5, 2009

16. Deposition Transcript of James E. Davey, MD, dated October 7, 2009

17. Deposition Transcript of Janet Vasquez, dated October 6, 2009

18. Section 13701 of the California Penal Code

19. *Navarro v. Block,* 72 F.3d 712 (9th Cir. 1995)

20. *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696 (9th Cir. 1990)

21. Medical records of April Clanton

22. Personnel and internal affairs records of Officer Madison

23. Personnel and internal affairs records of Officer Mitre

24. Personnel and internal affairs records of Officer Smith

## EXHIBITS

The following Exhibits support my opinions, and are appended to this report on a CD:

1. Nonlethal Weapons vs. Conventional Police Tactics: The Los Angeles Police Department Experience, by Greg Meyer (California State University, Los Angeles, 1991)

2. "Injury Profile of TASER® Electrical Conducted Energy Weapons (CEWs), Dr. William P. Bozeman, et al, Wake Forest University, poster

3. "The impact of conducted energy devices and other types of force and resistance on officer and suspect injuries," article, by Smith, Kaminski, Rojek, Alpert and Mathis, "Policing: An International Journal of Police Strategies &Management, Vol. 30, No. 3, 2007, ppg. 423-446

4. Photograph of a TASER X-26

5. "TASER® Electronic Control Device (ECD) Delivered Energy Basic Analogy Examples," March 19, 2008

6. Photograph of two Duracell 3-volt batteries that power the TASER

7. Police Executive Research Forum (PERF) Conducted Energy Device Policy and Training Guidelines for Consideration (October 2005) and glossary of terms

8. Conducted Energy Weapons guidelines published by the International Association of Chiefs of Police (IACP) (August 2005)

9. Greg Meyer's *curriculum vitae*

Vasquez v. Santa Paula, et al                                                                    19
Report of Defense Expert Greg Meyer

## EXPERT QUALIFICATIONS, PUBLICATIONS, AND OTHER CASES

My *curriculum vitae* is attached to this report (see **EXHIBIT NO. 9**). In compliance
with Rule 26, it documents the relevant publications that I have authored during the past 10 years
(and beyond), and it lists the relevant cases in which I have testified at trial or deposition during
the past 4 years (and beyond).

I am currently a consultant and expert witness who specializes in police procedures,
including use of force, especially for the TASER device. I have 30 years of experience with
various TASER devices and other nonlethal weapons devices (including shooting or deploying
them) in my official law enforcement capacity and my consulting capacity, including research,
static testing, field testing, actual field usages, designing and revising lesson plans for users and
instructors, training users, training instructors, writing published articles, lecturing on this
subject, conducting demonstrations (including voluntary exposures) for political officials and the
media, and experiencing the TASER effects. I have both supervised and adjudicated internal
investigations of TASER usage incidents. In my capacity as a commanding officer at the Los
Angeles Police Academy, I observed and participated in TASER training including TASER
exposures conducted by instructors who worked for me. I have personally been exposed to a
TASER device eight times over the past 30 years, including in the past decade being exposed to
an ADVANCED TASER M-26 at an instructor course at the Los Angeles Sheriff's Academy
(2001) and at an instructor course at the Alhambra (CA) Police Department (2003); and with the
TASER X-26 at an instructor course at the Los Angeles Police Academy (2005); and at an
instructor course at TASER International headquarters (2009). I have been a consultant and
expert witness on police use of force issues for 20 years. I have participated as an expert witness
or consultant in more than 100 criminal and civil actions in federal and state courts. More than
50 of those cases have involved TASER devices or "stun-guns" that use the TASER technology.
Additional expert qualifications are listed on page 2, above, and in my *curriculum vitae*.

## COMPENSATION

My fee for work including document review, research, meetings, and reports is $375 per hour.

My fee for deposition is $375 per hour.

My fee for court testimony is $3,000 per day.

Executed on February 10, 2010, at Glendale, California.

*Greg Meyer*

GREG MEYER