BRIAN A. VOGEL, SBN 167493
THE LAW OFFICES OF BRIAN A. VOGEL, PC
770 County Square Dr., Ste. 104
Ventura, CA 93003
Telephone: (805) 654-0400
Facsimile: (805) 654-0326
E-Mail: brian@bvogel.com

Attorney for Plaintiff
MAX VILLANUEVA VASQUEZ

**UNITED STATED DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MAX VILLANUEVA VASQUEZ, an individual<br><br>Plaintiff,<br><br>-vs-<br><br>THE CITY OF SANTA PAULA, THE SANTA PAULA POLICE DEPARTMENT, POLICE CHIEF STEVE MACKINNON, OFFICER CARLOS MITRE, OFFICER CODY MADISON, OFFICER RYAN SMITH in both their individual and official capacities, and DOES 1-10, inclusive.<br><br>Defendants. | CASE NO. CV09-02590 (DSF-MAN)<br><br>**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>Date: May 3, 2010<br>Time: 3:00 p.m.<br>Ctrm: 840 Roybal Courthouse |

# I. FACTUAL CONTENTIONS

## A. Statement of the Case.

This case involves an allegation of excessive force by police officers investigating a claim of domestic violence. Plaintiff has asserted causes of action under 42 U.S.C.

§1983, alleging violation of his Fourth Amendment right to be free from the use of excessive force by the individual defendant officers. The plaintiff further claims the existence of *City of Canton* and *Monell* municipal liability on the ground that there exists a custom, practice, or policy of failing to properly train officers who engage in a pattern and practice of inappropriate Taser application and a failure to discipline officers following their use of excessive force.

Officer Madison, a former bouncer at a bar, is approximately 6'2", 240 lbs. He was the first officer to arrive in response to April Clanton's call for assistance in which she claimed that Plaintiff had pushed her and slammed a gate into her arm. April also claimed that Plaintiff's mother was refusing to return their daughter to April. Officer Madison testified that when he arrived, he saw Plaintiff walk quickly to the front door of the house where he began knocking loudly and requesting that someone open the door. Officer Madison approached Plaintiff, ordered him to step away from the door and to sit down. Plaintiff eventually sat down and answered the officer's questions. Madison claims that he noticed that Plaintiff was bleeding from several small lacerations on his forearms. Plaintiff testified that he was not bleeding until after the officers used force upon him. While Plaintiff was still seated, Officer Mitre arrived. Madison asked Mitre to watch Mr. Vasquez while Madison went to speak with Ms. Clanton. Officer Mitre, who is no longer employed as a police officer, is approximately 5'6" 170 lbs. with a bodybuilder's physique. Plaintiff is tall and skinny at approximately 6'1" and 180 lbs. All parties agree that almost immediately after Officer Madison began to walk away,

Plaintiff stood up from his seated position.

Witness Jennifer Jump, a neighbor who had come over to briefly babysit Plaintiff's child, looked out through the glass window on the side of the front door and saw Plaintiff seated for approximately a minute and a half and talking in a calm tone of voice to the officers before he stood up. She says that Plaintiff stood up, pulled up his pants and then leaned over and spat in the planter beside him. Without warning, Officer Mitre grabbed Plaintiff by the wrist and then by the throat with his other hand, spun him around, and then pinned him against the garage door. Plaintiff agrees with this account and claims that Mitre squeezed his throat hard enough to cut off his ability to breathe. Plaintiff stated that on the ride to the hospital, Mitre jokingly referred to the chokehold as "the crawfish." (Some redness and bruising of the neck is visible in photographs taken at the hospital by Officer Mitre approximately 1-2 hours after the incident.) Plaintiff denies fighting with or resisting Mitre and both Plaintiff and Ms. Jump claim that Mitre completely controlled Plaintiff after Mitre grabbed him.

Officers Mitre and Madison both claim that Plaintiff tried to walk past Mitre toward the door of the house. Mitre claimed that he ordered Plaintiff to sit and then grabbed his wrist when he continued to walk towards the door. When Plaintiff pulled his wrist away, Mitre claims that he grabbed him with two hands on the front of his shirt and pushed him against the garage door. Madison claims that Mitre initially grabbed Plaintiff by the wrist, spun him around, and put his hands on Plaintiff's chest area below the neck.

Plaintiff and Officers Mitre and Madison all agree that while Mitre was holding

Plaintiff against the garage door, Madison approached and tased Plaintiff without any warning. Plaintiff claims that while he was incapacitated by the electricity, Mitre forced him to the ground face first and drove his head into the cement driveway causing a significant cut above his eyebrow. Madison and Mitre both claim that Mitre let go of Plaintiff when the taser was applied and that Plaintiff fell to the ground "unassisted." Ms. Jump testified that she saw Mitre in control of Plaintiff the entire time. She also saw Mitre place himself on top of Plaintiff as they went to the ground together. While he was still twitching from the taser's electricity, Plaintiff claims that Mitre pulled one of his hands behind his back and applied a handcuff. Again without warning, Madison pulled the trigger on the taser a second time, applying a painful shock for five more seconds. Officer Mitre testified that he recalled only one taser application at the garage door after which he was able to quickly handcuff Plaintiff on the ground without incident. Ms. Jump testified that the first taser application occurred after Plaintiff was forced to the ground and the second application occurred after Plaintiff had been handcuffed. The taser download indicates an eight second gap between the first and second taser applications. Madison testified that he tased Plaintiff a second time because Plaintiff was refusing to put his arms behind his back. Madison's tape recording begins around the time of the second taser application with Plaintiff screaming in pain.

Although there was a camera at the scene and Officer Mitre took pictures of April Clanton and blood on the driveway, no pictures were taken of Plaintiff's injuries at the scene. Santa Paula Police Dept. Order 8-8 requires officers who use a taser to photograph

all injuries and, in particular, the probes of the taser before and after their removal, when possible, and to photograph the head of the subject. Mitre candidly admitted that the reason that no pictures were taken was probably because Plaintiff was bleeding so heavily that they wanted to allow the paramedics to treat him and then quickly take him to the hospital.

This case hinges upon the jury's evaluation of the credibility of the witnesses. Ms. Jump was particularly credible at her deposition. If her testimony is believed, a verdict for the Plaintiff would quickly ensue. Even if the officers' story about Plaintiff trying to walk toward the door is believed, there is still no evidence of the kind of threat which would justify the extent of the force that was used against him. Plaintiff was unarmed and physically outmatched by the officers. The fact that the front door was locked and Plaintiff had been observed knocking and requesting entry further diminishes the reasonableness of any threat perceived by the officers from Plaintiff allegedly trying to walk towards the door to "escape," or "possibly retrieve a weapon."

Plaintiff seeks damages for pain and suffering, out-of-pocket expenses for medical treatment, and attorneys' fees and costs.

Liability is predicated as follows:

The First Claim for Relief is for violation of 42 U.S.C. §1983 against Defendant Officers Madison, Mitre and Smith for depriving Plaintiff, under color of law, of (1) Plaintiff's right to be free from excessive and unreasonable force in violation of his rights protected under the Fourth Amendment (2) the right to be free from abuse of process as

protected by the Fourth Amendment (3) the right to be free from malicious prosecution as protected by the Fourth Amendment and (4) the right to be free from a conspiracy to falsify evidence of the crimes of resisting arrest and battery on a police officer and thereafter prosecute Plaintiff in violation of his rights protected under the 4th and 14th Amendments.

The Second Claim for Relief is for violation of 42 U.S.C. §1983 against Defendants City, Chief Mackinnon, and Santa Paula Police Department for failure to train, investigate, or supervise causing constitutional violation as well as a custom causing constitutional violation.

**B. Personal Injury Information.**

Plaintiff claims he suffered out-of-pocket expenses of approximately $2,500 for the emergency room visit and brief loss of income. Before this case, he had never been arrested and he spent several days in jail before his mother posted bail on his behalf. He has a small scar under his eyebrow but has otherwise suffered no other permanent injury or disability. He also publicly suffered significant pain, humiliation and embarrassment from being beaten, tased and arrested in his own driveway.

**C. Comparative Fault.**

The comparative fault standard is not applicable to Plaintiff's claims.

## II. ISSUES OF LAW

**A. Elements Required to Establish Plaintiff's Claims.**

Defendants' liability is founded, primarily, under 42 .S.C. § 1983, which provides,

in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privilege, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." Defendants' use of excessive force on plaintiff is actionable under § 1983. *Monroe v. Pape* 365 U.S. 167 (1961).

Under Section 1983, individual liability lies where (1) the conduct complained of was committed by a person acting under color of state law and (2) the conduct deprived a person of rights, privileges, or immunities secured by the Constitution of the United States. *Smith v. City of Fontana,* 818 F.2d 1411, 1415 n.5 (9th Cir. 1987). In evaluating a § 1983 claim against an officer, the court applies a two-part analysis. The "threshold question" is "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (abrogated in part on other grounds by *Pearson v. Callahan*, ---U.S. ----, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009)). "If the Constitution was not violated, that is the end of the inquiry. If there was a violation, however, the courts proceed to the question of qualified immunity. Officers are protected by qualified immunity, which is "an immunity from suit rather than a mere defense to liability," *Pearson* 129 S.Ct. at 815.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their

persons ... against unreasonable searches and seizures" U.S. Constitution, 4th Amendment. When a plaintiff claims that he was not "secure in his person" because law enforcement officers used excessive and, therefore, "unreasonable" force in the course of an arrest, the court balances " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against 'the countervailing government interests at stake.' " *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir.2003) (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). In conducting this inquiry, the court applies a three-step analysis. First, the court assesses the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted." Second, the court analyzes the importance of the government interests at stake by evaluating: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id.* At the second stage of the analysis, the court may also consider other factors, such as "the availability of alternative methods of capturing or subduing a suspect." See *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005).

Finally, the court weighs the gravity of the intrusion against the government's interest to determine whether the force used was constitutionally reasonable. *Miller*, *supra*, 340 F.3d at 964. "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... [P]olice officers are often forced to make split-second judgments-in

circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation. *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In addition to the *Graham/Miller* factors, a consideration of the totality of the circumstances may look to other factors as well. See *Forrester v. City of San Diego*, 25 F.3d 804, 806 n. 2 (9th Cir. 1994). In particular, the availability of alternative methods is a proper factor to consider. *Smith, supra*, 394 F.3d at 701.

The doctrine of qualified immunity shields the officers "from liability for civil damages [unless their conduct violated] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). A right is "clearly established" if " 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' " *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir.2003) (quoting *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151). An officer will therefore be entitled to qualified immunity even if he was mistaken in his belief that his conduct was lawful, so long as that belief was reasonable. *Id.* at 955.

The City and Police Department are liable based upon their failure to train, investigate, or supervise causing constitutional violation and custom causing constitutional violation. Where a municipality's failure to train its personnel in a relevant respect evidences a "deliberate indifference" to the rights of it citizens such a failure may be considered actionable as a custom or policy which violates 42 U.S.C. § 1983. *Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197 (1989).

**B. Plaintiff's Key Evidence In Support of Each Claim.**

<u>Plaintiffs' First Claim against Defendants Santa Paula Police Officers Carlos Mitre and Cody Madison for 4th Amendment Violations – Excessive Use of Force</u>:

(a) The ultimate facts required to prove such claim under the applicable legal standard is that the force used by Santa Paula Police Officers Carlos Mitre, ("MITRE") and Cody Madison ("MADISON") was objectively unreasonable.

(b) The evidence relied upon to prove each element of the claim is:

(1) That at all times during this incident, Defendants MITRE and MADISON, acted under color of law as police officers for the City of Santa Paula.

(2) That in their capacity as police officers for the City of Santa Paula, on April 15, 2007, they, intentionally deprived plaintiff, Max Vasquez, of his 4th Amendment rights to be free from unreasonable seizure by subjecting plaintiff to the excessive use of force — forcibly tackling plaintiff to the ground and tasing him twice.

(3) That there was no objectively reasonable basis for subjecting plaintiff, Max Vasquez, to the use of force employed by defendants, because he had no criminal record, was unarmed, was not a fleeing felon, and posed no serious threat of serious bodily harm to the officers present or anyone else.

(4) Defendants, MITRE and MADISON, by unnecessarily and unreasonably tasing plaintiff and forcibly tackling him to the ground caused plaintiff to suffer physical injuries, as well as extreme pain and suffering.

(5) That as a cause of said deprivation of his constitutional rights, plaintiff has

suffered extreme emotional distress. Max Vasquez hereby seeks compensatory and punitive damages against Defendants MITRE and MADISON in both their official as well as individual capacity.

Plaintiffs' Second Claim against Defendants City of Santa Paula ("CITY"), the Santa Police Department, ("SPPD") and Santa Paula Chief of Police Steve MacKinnon ("MACKINNON") for engaging in a deliberately indifferent customs, practices, and policies violative of Plaintiff's federally protected rights under *Monell* and its progeny:

(a) The ultimate facts required to prove such a claim under the applicable legal standard is that the training program of Defendants, CITY, SPPD and MACKINNON, was inadequate to train the officer Defendants MITRE and MADISON in how and when to use force. Further, that said Defendants employ an unwritten policy as a means of covering-up any misconduct of any officer that unnecessarily uses force against a person.

(b) The evidence relied upon to prove each element of the claim is:

(1) The Defendants, CITY, SPPD and MACKINNON, were deliberately indifferent to the need to adequately train officers, including MITRE and MADISON, regarding interaction and detention of suspects as well as the use of force. In addition, that the efendants, CITY, SPPD and MACKINNON, were deliberately indifferent to persons against whom force was unnecessarily used due to an unwritten policy to arrest the person to cover-up any potential misconduct of Santa Paula Police Department officers. The Defendants, CITY, SPPD and MACKINNON, were further deliberately indifferent to persons against whom force was unnecessarily used due to an unwritten

policy of officers using unjustified force during arrests and then falsely claiming that the force was justified because the arrestee was resisting arrest or attacking the officer.

(2) The failure to provide training, and the implementation of the unwritten policies, were a cause of the deprivation of the plaintiff's constitutional rights protected by the 4th Amendment of the Constitution, as set forth in Claim One.

(3) That plaintiff's sustained the damages set forth in Claim One as a result of Defendants'CITY, SPPD and MACKINNON'S failure to properly train Defendants MITRE and MADISON, and the improper implementation of unwritten policies to cover-up any potential misconduct of Defendants MITRE and MADISON.

**III. Evidentiary Problems**

The evidentiary issues in dispute are specifically identified and addressed in both the Plaintiff and Defendants' motions in limine.

**IV. Bifurcation of Issues**

Plaintiff does not request any bifurcation of issues in this matter.

**V. Jury Trial**

Timely demand was made by Plaintiff for a jury trial in this matter.

**VI. Attorney's Fees**

Plaintiff agrees that the Court reserve jurisdiction for the purpose of determining after trial the amount of attorney's fees to be granted pursuant to 42 U.S.C. § 1988.

**VII. Abandonment of Issues**

Plaintiff has agreed to dismiss Defendant Ryan Smith with prejudice but is

otherwise not abandoning any issues.

DATED: April 12, 2010

THE LAW OFFICES OF BRIAN A. VOGEL, PC

By: [signature]
Brian A. Vogel
Attorney for Plaintiff
Max Villanueva Vasquez