# EXHIBIT E

CERTIFIED COPY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAX VILLANUEVA VASQUEZ, AN INDIVIDUAL,<br><br>PLAINTIFF,<br><br>-vs-<br><br>THE CITY OF SANTA PAULA, THE SANTA PAULA POLICE DEPARTMENT, POLICE CHIEF STEVE MACKINNON, OFFICER CARLOS MITRE, OFFICER CODY MADISON, OFFICER RYAN SMITH IN BOTH THEIR INDIVIDUAL AND OFFICIAL CAPACITIES, AND DOES 1-10, INCLUSIVE,<br><br>DEFENDANTS. | (PAGES 1-51)<br><br>CASE NO. CV 09-02590 DSF (MANx) |

DEPOSITION OF STEPHEN MacKINNON

MONDAY, MARCH 1, 2010, 11:19 A.M.

OUR FILE NO:   100301GAS2

REPORTED BY:   GINA A. STACY, C.S.R. 7927



COURT REPORTERS, INC.

Personal Court Reporters
Sylvia Becker & Associates
Rose Reporting Service
Clifton-Strickland Reporters
Reason Reporting

Van Nuys • (818) 988-1900 • Los Angeles • (323) 857-1010
Ventura (805) 654-1058 • Santa Barbara • (805) 966-0177



```
 1                        I N D E X
 2
 3  WITNESS              EXAMINATION              PAGE
 4  STEPHEN MacKINNON    BY MR. VOGEL             4
 5                       BY MR. HELD              46
 6
 7                       E X H I B I T S
 8
 9  NO.    PAGE   DESCRIPTION
10
11  D      24     POLICE REPORTS, USE OF FORCE REPORTS AND
12                USE OF FORCE MEMO
13  G      44     TASER LOG
14  M      11     SANTA PAULA POLICE DEPARTMENT MEMORANDUM RE
15                MAY TRAINING ATTENDANCE RECORDS, TRAINING
16                OUTLINE AND USER COURSE
17  N      17     GENERAL ORDER 8-8
18  O      33     GENERAL ORDER 9-2
19  P      33     GENERAL ORDER 8-1
20  Q      33     GENERAL ORDER 14-2
21  R      33     GENERAL ORDER 8-3
22  S      33     GENERAL ORDER 8-9
23  T      33     GENERAL ORDER 9-5
24  U      33     GENERAL ORDER 16-1
25
```

3

```
 1                    VENTURA, CALIFORNIA
 2            MONDAY, MARCH 1, 2010, 11:19 A.M.
 3
 4                    STEPHEN MacKINNON,
 5   HAVING BEEN FIRST DULY SWORN BY THE REPORTER, WAS
 6            EXAMINED AND TESTIFIED AS FOLLOWS:
 7
 8                        EXAMINATION
 9   BY MR. VOGEL:
10      Q    Please state your name for the record.
11      A    Sure.  Stephen MacKinnon, M-a-c-K-i-n-n-o-n.
12      Q    Have you ever been known by any other names?
13      A    No.
14      Q    Other than testifying in criminal court as a
15   police officer, have you ever been a party to a lawsuit?
16      A    Yes.
17      Q    And how many times?
18      A    With this agency probably two to three times in
19   addition to this, and with other agencies that I've led,
20   probably two or three times as well.
21      Q    And have you ever testified in a deposition
22   before?
23      A    Yes, I have.
24      Q    How many times?
25      A    Twice.
```

                                                        4

```
 1        2007?
 2     A     It went into effect 2006.  But it was -- unless
 3  there was an update, this should have been the policy
 4  that was in place in 2007.
 5     Q     Okay.  And this particular general order governs
 6  the use of force investigations; is that right?
 7     A     Yes.
 8     Q     And what is the purpose of these use of force
 9  investigations?
10     A     To do an additional internal review of officer
11  conduct when there was a decision to use force in an
12  incident.
13     Q     Who conducts the use of force investigations in
14  your department during this period of time April 15 of
15  2007?
16     A     It depends on which officer uses it, as far as
17  the review.  The officer's immediate supervisor will do
18  the initial review, and it goes to the lieutenant that
19  oversees that division.  So it would be one of two
20  lieutenants that the division lieutenant would conduct
21  further review and provide input, and then I provide the
22  final review.
23           MR. VOGEL:  Off the record.
24                (Discussion off the record.)
25           MR. VOGEL:  Back on the record.
```

20

1  Q   Do you or any of your lieutenants perform any
2  investigation of these individual use of force, beyond
3  reading the officer's use of force report?
4  A   It depends on the contents of the report as far
5  as any additional investigation.
6  Q   What kind of additional investigation do you do?
7     MR. HELD: I'm going to object that this line of
8  questioning into post hoc investigation is violative of
9  the Ninth Circuit decision in Maddox versus of the County
10 of Los Angeles and the explicit time frame requirement of
11 Fourth Amendment analysis as indicated by the Supreme
12 Court's use of the phrase, quote, "at the moment,"
13 unquote in Graham versus Connor and further construed by
14 appellate authorities in Schultz versus Long; Bella
15 versus Chamberlain; Billington versus Smith.
16     All of these questions are relevant, if at all,
17 to the Monell phase, if there is such a phase. So I'm
18 going to object to this line of questioning, and by
19 stating this objection now, I won't need to interrupt you
20 further.
21     MR. VOGEL: Thank you.
22 Q   Chief, if you recall the question -- and I'll
23 rephrase it. What kind of further investigation do you
24 do beyond reading the officers' use the force reports?
25 A   As I said, it depends on the contents of the

21

1  report, which may prompt additional questions as to the
2  reasoning why the officer chose to take the action he
3  did. It may be a follow-up to the officer or the
4  supervisor asking clarifying questions. Reviewing the
5  actual arrest report. Asking maybe other officers at the
6  scene to get additional information prior to coming to a
7  conclusion.
8      Q   So you don't assume that everything the officer
9  writes in his use of force report is true?
10     A   No. I assume that everything in the report is
11 true.
12     Q   And when you do follow-up investigations and you
13 learn something that conflicts with something in the use
14 of force report, what kind of action is taken at that
15 point?
16     A   I can't recall an instance where we found
17 conflicting information. But if, during the
18 investigation, we found conflicting information, we would
19 probably look into it further.
20     Q   So during your tenure on the Santa Paula Police
21 Department, you cannot recall any use of force
22 investigation where you found conflicting information
23 with an officer's use the force report?
24     A   I don't recall any.
25     Q   Okay. Do you recall any investigation during

22

1  your tenure on the Santa Paula Police Department where
2  the investigation resulted in the discipline of an
3  officer?
4      A    For use of force -- after reviewing a use of
5  force report?
6      Q    Yes.
7      MR. HELD: Chief, before you respond, this, as
8  asked, is perfectly acceptable.  But it does call for a
9  yes or a no or an I don't remember response.  Beyond
10 that, we may be straying into the personnel rights of
11 officers not embraced or encompassed within Magistrate
12 Judge Nagel's order.
13     THE WITNESS: Okay.  In answering your question,
14 no, I don't recall any internal investigation that
15 resulted in discipline.
16 BY MR. VOGEL:
17     Q    And, obviously, that would include this
18 particular use of force investigation relating to the
19 incident April 15, 2007, involving Officer Madison,
20 Officer Mitre, and Officer Smith; correct?
21     A    That is correct.  No discipline took place as a
22 result of that review.
23     Q    Could you describe who is on the use of force
24 committee now?
25     A    I think you need to understand how it works.  We

1   have a use of force review committee that conducts an
2   annual review of all use of force for the previous year.
3   This year's committee, for example, is the Range Master
4   Dave Manning, Lieutenant Carlos Juarez, Sergeant Ismael
5   Cordero, and Officer Daniel Krenitsky.
6         That formal review committee periodically
7   changes, but that formal committee does not conduct the
8   review of each individual report as they are submitted.
9   As stated before, that review is conducted by the
10  immediate supervisor of the officer using the force, the
11  lieutenant that oversees the division in which the
12  officer is assigned, and then myself.
13     Q    With respect to this particular case, if you
14  could turn to Exhibit D, as in David.
15     A    Okay.
16     Q    Take a look at the end, the last two documents,
17  Bates stamp numbers -- I'm sorry -- last three pages,
18  Bates stamps numbers 1014, 1015, and 1016.
19     A    Okay.
20     Q    Let's start with 1014 and 1015. Does that appear
21  to be a Santa Paula Police Department use of force report
22  relating to an incident that occurred on April 15, 2007,
23  involving officers Madison, Mitre, Smith, and Max
24  Vasquez?
25     A    Yes.

24

1  Q    And at the bottom of Bates stamp 1014, it appears
2  that your name and signature are on the document; is that
3  right?
4  A    Yes.
5  Q    And that is your signature?
6  A    It is.
7  Q    And so you reviewed this particular use of force
8  report; is that right?
9  A    Yes.
10 Q    And it was also reviewed by Lieutenant Saviers;
11 is that correct?
12 A    That's correct.
13 Q    And in looking at Bates stamp 1016, the third
14 page there, that appears to be a memo sent to you from
15 Lieutenant Saviers relating to this particular use of
16 force; is that right?
17 A    It is.
18 Q    And you reviewed both the use of force report
19 submitted by officer Madison as well as the use of
20 force -- or this memo written by Lieutenant Saviers
21 before you applied your signature here on Bates stamp
22 1014; is that right?
23 A    Yes.
24 Q    With respect to this particular incident, was
25 there, to your knowledge, any additional investigation

25

Personal Court Reporters • San Fernando Valley • (818) 988-1900 • Santa Barbara • (805) 966-0177 • Ventura • (805) 654-1058

```
 1  done beyond simply reviewing the officer's use the force
 2  report?
 3      A    To my knowledge, no.
 4      Q    Okay.  And so just from your personal knowledge,
 5  you did not listen to any of the audio tape; is that
 6  right?
 7      A    I can't say for certain.  I have listened to
 8  audio tapes in the past as part of the review process.  I
 9  can't say if I listened to it on this particular review.
10      Q    Okay.  Do you recall whether or not you checked
11  the Taser download report in connection with the review
12  of this particular incident?
13      A    I can't recall if I did.  I reviewed such reports
14  in the past, but I don't recall in this case if I did.
15      Q    So it would be fair to say that it's not routine,
16  as part of your use of force investigation, to listen to
17  audio tapes or check the Taser downloads in each and
18  every investigation; correct?
19      A    That's true.
20      Q    Back at -- on April 15 of 2007, who was
21  responsible for maintaining the Tasers in your
22  department?
23      A    You would have to define "maintain."  Because we
24  have two officers involved where they have specific
25  duties.
```

26

1   Q   It may be easier for you just to describe who
2   those people are and what their duties are.
3   A   Okay.  David Manning, who we talked about before.
4   He is responsible for maintenance problems with the
5   Taser, if it's malfunctioning in some way.  He's the
6   liaison with Taser International, if anything is going to
7   be sent back, or has any correspondence with the company
8   as far as issues with it.
9       Lieutenant Carlos Juarez is responsible for the
10  maintenance of the records for each Taser.  He maintains
11  downloads.  He's responsible on a semiannual basis to
12  download all the Tasers, and he receives each Taser, when
13  it's been discharged in the field, to do a downloaded and
14  maintain that as part of the file.
15  Q   And are both of these gentlemen -- you've
16  answered they were on the use of force committee
17  currently?
18  A   That's correct.
19  Q   And were they on the use of force committee back
20  in the year 2007?
21  A   I know Dave Manning was.  I'd have to check who
22  else was on the committee.  But Lieutenant Carlos Juarez
23  was with not at that time.
24  Q   Okay.  Does the use of force committee generate
25  any reports?

27

```
 1   STATE OF CALIFORNIA              )
 2   COUNTY OF VENTURA                )  ss.
 3
 4
 5        I, GINA A. STACY, C.S.R. No. 7927, in
 6   and for the State of California, do hereby certify:
 7        That prior to being examined, the witness named
 8   in the foregoing deposition was by me duly sworn to
 9   testify the truth, the whole truth, and nothing but the
10   truth;
11        That said deposition was taken down by me in
12   shorthand at the time and place therein named and
13   thereafter reduced to typewriting under my direction, and
14   the same is a true, correct, and complete transcript of
15   said proceedings;
16        I further certify that I am not interested in the
17   event of the action.
18        Witness my hand this  12  day of
19   ____March_____, 20 10.
20
21
22                            ___Gina Stacy_____
23                            Certified Shorthand
24                            Reporter for the
25                            State of California
```

# EXHIBIT D

# Santa Paula Police Department
## Use of Force Report

### GENERAL INFORMATION

| Date | 04/15/07 | Time | 2004 hrs. | Location | 759 Fillmore St. |
|---|---|---|---|---|---|
| Type of Call | Domestic Dispute / Child Custody | | | CFS/DR # | SF0701319 |

### TYPE OF FORCE USED

| Physical | X | Baton | | Bean bag | | Chemical/OC | | Firearm | | Taser | X | K-9 | | Other - See Synopsis | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

### SUBJECT PERSONAL DATA

| Sex | M | Age | 24 | Height | 6-02 | Weight | 156 | Other | |
|---|---|---|---|---|---|---|---|---|---|

### INJURY INFORMATION

| Nature of Injuries | ½" laceration on right eye brow, misc. scratches on both elbows/forearms, 2 punctures in left torso from taser, bruising on both sides of the neck |
|---|---|
| Hospital | Yes |
| Physician | Dr. Davey |
| Hospital Admission for injuries | No |
| Hospital Admission for Psychiatric | No |
| Under the Influence? | Drugs/Alcohol (specify): Alcohol |
| Treatment | Yes |
| Subject's Demeanor (Post-force use) | Initially verbally abusive, then apologetic |
| Were Officers Injured | Name: No |
| Nature of Injuries | N/A |
| Treatment | N/A |



### TASER APPLICATION

| Taser # 3 | | Number of Cycles applied | 2 | Air Cartridge# 1224890 | | Air Cartridge # N/A | |
|---|---|---|---|---|---|---|---|
| Useage: | Arc Display | No | Laser Display | Yes | Drive Stun | No | Dart Deployment | Yes |
| Approx. distance to target when probes deployed | | 3 ft | Approximate distance between probes (in inches) | | 12 |
| Was there one or two probe contact? | 2 | Was there skin penetration? | Yes | Probes removed at the scene? | Yes |

### SYNOPSIS

On 04/15/07 at approx. 2004 hours I, Sr. Ofr. Madison, and Ofr. Mitre were dispatched for a domestic dispute/child custody to a unknown address on Fillmore St. Upon arrival we were to contact the reporting party, April Clanton, in a white Toyota Corolla. The disturbing party was Max Vasquez. Upon arrival the white Toyota was found parked one house west of 759 Fillmore St. I parked my unit and exited it. I immediately noticed the female standing next to the car, later identified as Clanton, was crying hysterically and a white male, later identified as Vasquez, was walking rapidly away from Clanton up the driveway of 759 Fillmore St. As I was walking past Clanton I asked her who the male subject was and she said it was her ex-boyfriend. As I began to walk up the driveway I heard Vasquez banging heavily on the front door of 759 Fillmore St. demanding the front door be opened. Due to Vasquez's actions it appeared he may be trying to flee the scene so I told Ofr. Mitre to expedite his response due to the possibility of have to use force. I contacted Vasquez and asked him what was going on. Vasquez said nothing was going on so I asked him who the woman was out front. Vasquez said he did not know her and told me to go ask her. Based on that statement and Clanton's I believed Vasquez was lying to me at this point, possibly to escape arrest. At that time I noticed small lacerations on Vasquez's forearms and blood on them. I told Vasquez to sit down. I had to ask Vasquez several times to sit down before he did. I then asked Vasquez again what was going on and he said "nothing". I asked Vasquez several more times the same question and he finally said he was bleeding because he had damaged his own vehicle. I asked him again why the woman was upset out front and Vasquez replied he did not know and to ask her. By this time Ofr. Mitre arrived on scene and I asked Ofr. Mitre to watch Vasquez while I contacted

| Were Photographs taken? | Yes | Synopsis continued on attached page(s) | |

### REVIEW

| Submitted by | Sr. Ofr. C. Madison | Signature | | Date | 04/15/07 |
|---|---|---|---|---|---|
| Reviewed by | Lt. M. Saviers | Signature | #1016 | Date | 4/16/07 |
| Reviewed by | Chief Mackinow | Signature | | Date | 4-23-07 |

Commentary by Reviewers (to include if in compliance with policy):
See Attached

No issues – in compliance with policy.

Attachment: G.O. #14-2A

1014

Clanton. As I began to walk away I overheard Ofr. Mitre ordering Vasquez to sit down in a loud voice. As I turned around I saw Ofr. Mitre grab the left wrist of Vasquez. Vasquez attempted to pull away however Ofr. Mitre was able to pull him back. When Ofr. Mitre did this he spun Vasquez, holding onto his wrist, in a ¾ turn and ended with Vasquez's back against the garage door. At this time Vasquez was facing Ofr. Mitre. Ofr. Mitre ordered Vasquez to get on the ground two times and Vasquez did not comply. Ofr. Mitre then grabbed his shirt in the neck area to force him to the ground. Due to the suspects actions of appearing to attempt to flee the scene, his untruthfulness, the injuries on his forearms which I was unable to confirm the source, and continued resistance to Ofr. Mitre I removed my taser from the holster. I fired the taser into the left torso/rib area of Vasquez. Vasquez immediately stiffened up and fell to the ground. I allowed the taser to cycle for 5 seconds and Ofr. Mitre and I told Vasquez to place his hands behind his back. Vasquez was still not complying with officers commands by not putting his hands behind his back. Fearing he may have a weapon and the above mentioned circumstances I then applied another 5 second cycle of the taser. Vasquez then complied and placed both his hands behind his back. Due to Vasquez's injuries EMS was asked to respond. At this time Vasquez was verbally abusive to officers. Once the paramedics and fire dept. arrived on scene they treated Vasquez for his injuries. Vasquez then apologized to both Ofr. Mitre and myself for his actions. Vasquez was then transported to the hospital for medical clearance.

    Vasquez received the laceration to his eye brow due to falling when he received the initial taser application. The lacerations on his forearms were apparently received from his vandalizing his own vehicle. The lacerations on his elbows were possibly received from struggling with officers. The bruising around his neck was received from Ofr. Mitre when Vasquez was up against the garage door.


Cody Madison
Senior Officer

**Santa Paula Police**

# Memo

To: Chief MacKinnon

From: Lt. Michael Saviers

Date: April 16, 2007

Re: Use of Force – SF0701319

---

Chief MacKinnon, I have reviewed the Use of Force report submitted by Sr. Ofc. Madison concerning his deploying of a Electronic Control Device; Taser. It appears that Sr. Ofc. Madison was within the policy of the Santa Paula Police Department's General Order #8-8 when he deployed his department issued Taser towards an actively resisting male subject being detained for a domestic violence investigation.

Sr. Ofc. Madison heard Ofc. Mitre giving verbal commands to a male subject being investigated for a domestic dispute who appeared to be attempting to flee. Sr. Ofc. Madison then observed Ofc. Mitre in a physical altercation with the male subject, 6'2", 156 lbs., who was attempting to break free of Ofc. Mitre. Ofc. Mitre was trying to control the subject by grabbing him by his wrists and clothing and the subject was resisting the verbal and physical control holds of Ofc. Mitre.

Sr. Ofc. Madison deployed a 5 sec. activation of his Taser and the subject fell to the ground however continued to resist his detention by not presenting his hands for handcuffing. Sr. Ofc. Madison then activated his Taser a second time for a 5 second period. The male subject complied with the officer's orders and was handcuffed.

The male individual suffered a laceration over his right eye (from the initial Taser activation when he fell), abrasions and bruising to his neck and lacerations on his elbows from the altercation with officers. No officers were injured. At the scene the male subject apologized for his actions.

Respectfully,

*[signature]*

1

1016