# EXHIBIT G

```
                                                                    1

 1                    UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3                              ---

 4         THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

 5

 6

 7    Max Villanueva Vasquez,            )
                                         )
 8                       Plaintiff,      )
                                         )
 9                                       )
                                         )
10    vs.                                )   CV 09-2590-DSF(MANx)
                                         )
11                                       )
                                         )
12    City of Santa Paula,               )
                                         )
13                       Defendant.      )
                                         )
14    _____       )

15

16

17            REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

18                             Day 3

19                      Los Angeles, California

20                      Thursday, July 1, 2010

21

22    Pamela A. Batalo, CSR, FCRR
      Official Reporter
23    Roybal Federal Building
      255 East Temple Street
24    Room 181-I
      Los Angeles, California  90012
25    (213) 687-0446
```

1    The next factor which you should consider in this
2    matter, ladies and gentlemen, is the type and amount of force
3    used.  It began with at least a wrist restraint, but there was
4    also an immediate chokehold.  The crawdad.  He was spun around,
5    and it was a fluid motion right into the garage, and he was held
6    there and then taken to the ground.
7    The taser was employed twice, eight seconds apart, and
8    the application of the second taser occurred when one hand was
9    cuffed behind his back and the other was pinned against the side
10   of the garage door.  Look at the photographic evidence of where
11   the blood is.  That's where his head was, and he was pushed up
12   against that garage door with an officer on top of him pulling
13   one of his hands back behind his back.  That's the positioning
14   when the taser is deployed the second time.
15   His injuries include the handcuffs were too tight and
16   his neck was significantly bruised.  He had a fairly significant
17   gash over his eye.  And then, of course, the darts left these
18   two marks, probably about eight inches apart on his side, and
19   there in the very lower corner on the front of his abdomen, you
20   can see a bruise.  He was threatened three times.
21                   (Audio was played for the jury)
22            MR. VOGEL:  You should also look at the availability
23   of alternative methods to seize or subdue the subject.  Here all
24   that would have been required is two steps.  Look at the size of
25   Defendant Madison.  Mr. Vasquez was on the ground, hand behind

1  his back with another officer handcuffing him when the taser got
2  applied the second time.  Two steps is all that would have been
3  required.  Not a second application of the taser.
4          Was a warning given?  Officer Mitre says -- and he
5  testified here on the witness stand.  He said Officer Madison
6  said, "Taser, taser, taser."  We know that on the tape there was
7  "Sorry.  I didn't say taser."  "I know."
8          There were three threats to Max Vasquez after he was
9  handcuffed, but there were no warnings.
10         This is Janet Vasquez's photo of the pool of blood.
11 That's where his head came to rest.  And you contrast that with
12 the police photo taken on that night, it looks, you know, a lot
13 more small and insignificant.  It was a significant pool of
14 blood.  His injuries were significant.  Thankfully they didn't
15 result in any permanent disfigurement, no permanent harm.  Maybe
16 a little blurry vision for a while.  He was sore for a few days,
17 but thankfully there is no permanent disfigurement or anything
18 like that.  He didn't go and seek additional medical treatment
19 or a chiropractor.  He didn't have the money to pay for private
20 treatment, and he's fine.  We're not asking you, in this case,
21 for a huge damages verdict.  It's the principle of the matter.
22         The biggest harm in this case is the fact that he was
23 beaten, tased and humiliated in the driveway of his own home.
24 It's that constitutional injury, his right to be free from that,
25 that we're here asking you to vindicate.  We're here asking you

1   to stand up for his constitutional rights.  It's your
2   determination.
3          In terms of damages, you determine the amount of money
4   that will reasonably and fairly compensate him for any injury
5   which you find was caused by the defendants or either of them.
6   There is no huge economic damages claimed here.  But there is a
7   significant constitutional injury.  And for that, we ask you to
8   return a verdict that you think is reasonable in terms of a
9   monetary verdict.
10         But it's more important that you return a verdict for
11  the plaintiff to speak up to the principle.  These defendants
12  over here should stand for a much higher standard.  On that day,
13  the force used against Max Vasquez under the circumstances was
14  entirely unreasonable, and it resulted in injuries.  And you can
15  see the differences between the police photos and the photos
16  that Ms. Vasquez took later.  You can see his eye was swollen,
17  and it was obviously hurt.
18         But in this case, in this case, the attitude of the
19  defendants --
20                  (Audio was played for the jury)
21     MR. VOGEL:  -- is displayed in that tape recording by
22  that quote.  And you heard him talk about that.  "Look what
23  Daddy did.  Daddy beat the shit" -- and you can hear the glee in
24  his voice when he describes that he got to use the taser.
25         Ladies and gentlemen, we're asking you by your verdict

1  to return a verdict that's supported by the evidence required by
2  law and demanded by justice.  What happened to Max Vasquez is
3  not okay.  We're not asking for a huge amount of money here, but
4  we're asking you to tell them that it's not okay.  And justice
5  in this case demands a verdict for the plaintiff.
6          Thank you.
7          THE COURT:  Thank you, Mr. Vogel.
8          Mr. Wisotsky.
9          MR. WISOTSKY:  Thank you.
10                  DEFENSE CLOSING ARGUMENT
11         MR. WISOTSKY:  Good afternoon, ladies and gentlemen.
12 Let me first thank you personally on behalf of my colleague,
13 Mr. Held, and most importantly, my clients, Cody Madison and
14 Carlos Mitre, for the time and commitment that you have given to
15 us, albeit relatively brief in comparison to some cases that
16 take much longer.  But nonetheless, it was an imposition on your
17 life and your schedule.  Some of you had to travel a substantial
18 distance.  So from all of us, we thank you for making the jury
19 system work.  It's an important component of the Constitution of
20 the United States of America, just as the amendment that we're
21 discussing in this case, the Fourth Amendment of the Bill of
22 Rights for individuals to be free from unreasonable --
23 unreasonable searches and seizures.  This is what makes the
24 system work and this is what makes this country great.
25         The case is about excessive force, and it is about

```
 1  at a time.
 2          MR. HELD:  That's true.
 3          THE COURT:  I assume you all plan to be here tomorrow,
 4  parties and counsel?
 5          MR. WISOTSKY:  Yes, Your Honor.  I just can't sit
 6  anymore when I talk.  You got me -- not you, everybody.
 7          THE COURT:  That's the way I like it.  Once I got
 8  here, everybody has to stand.  Nobody stood over there.
 9          MR. WISOTSKY:  I do this at the dinner table.
10          MR. HELD:  Are we going to be all day tomorrow?
11          MR. WISOTSKY:  We stay here.  We are just a couple
12  blocks away.  We will be here as long as we have to.  It takes
13  10 minutes, 12 minutes to walk over.
14          THE CLERK:  Looks like they have a schedule.  It will
15  be here in a minute.
16          THE COURT:  Excellent.
17          MR. WISOTSKY:  I didn't hear.
18          THE COURT:  Which tape recorder are they -- hello?
19          MR. WISOTSKY:  Which tape recorder?  I prefer the
20  larger boom box.  The quality is better.  They listen to it all
21  at the same time.
22          MR. VOGEL:  I agree.
23          THE COURT:  Can you handle that, Ms. Keifer?
24          What do you need to do to make your decision on
25  *Monell*?
```

```
 1              MR. VOGEL:  I was going to make a couple of phone
 2   calls.
 3              THE COURT:  Go ahead.
 4                       (Off the record)
 5              THE COURT:  You can have a seat.  All right.
 6         Have you had an opportunity to make a decision yet,
 7   Mr. Vogel?
 8              MR. VOGEL:  Yes, Your Honor.  I think we will be able
 9   to enter into a stipulation that would avoid the Monell claim.
10              MR. WISOTSKY:  And --
11              MR. VOGEL:  And the punitive damages phase.
12              THE COURT:  And the punitive damages phase.  Okay.
13   What does that mean?
14              MR. WISOTSKY:  That means, Your Honor, that the
15   defendant -- the Defendant City through its joint powers of
16   authority will stipulate that any compensatory damage award in
17   favor of the plaintiff against these two officers will be paid
18   by the City through its joint powers authority, notwithstanding
19   the fact that there is no legal obligation for them to do so on
20   a civil rights violation.  There is no state law recovery here,
21   no respondeat superior or vicarious liability, but in exchange
22   for the waiver by the plaintiff of a Monell claim and a punitive
23   damage claim, we will so enter into that stipulation with the
24   caveat that we are not relinquishing any rights of appeal if it
25   so merits pursuing that.
```

```
 1              THE COURT:  All right.  So the plaintiff is
 2   stipulating that he will not pursue punitive damages and will
 3   not pursue a Monell claim in exchange for the City of
 4   Santa Paula agreeing that it will pay any compensatory damages
 5   awarded against one or both of these officers.  Nevertheless,
 6   the City will maintain -- both sides, both sides would maintain
 7   their ability to appeal the decision.
 8              MR. WISOTSKY:  Correct.
 9              THE COURT:  Is that correct?
10              MR. WISOTSKY:  That is absolutely correct.
11              THE COURT:  Do you have the authority on behalf the
12   City to agree that?
13              MR. WISOTSKY:  I have done it before.  I suspect I
14   have it here.  Yes, I do.  Yes, I do.
15              THE COURT:  All right.  And, Mr. Vogel, is that your
16   stipulation?
17              MR. VOGEL:  Your Honor, I haven't had a chance to
18   really discuss this -- the intricacies with my client, and I
19   just wanted to have a few minutes to do that before we enter
20   into the stipulation.
21              THE COURT:  Sure.  Let me tell you first about our
22   jury schedule.  Note 1 says, "We will maintain the same schedule
23   today, 8:00 to 2:00.  From tomorrow onward, we will meet 8:00 to
24   2:00 p.m. with one 15-minute break and one 30-minute lunch."
25   And then it says "11:30 lunch and 1:00 p.m. break."
```

```
 1              Notes 2 and 3 I have dealt with without consulting
 2   with you.  Note 2 is, "We respectfully request a coffee machine.
 3   Thank you."
 4              Note 3 is, "We request that the AC system be turned
 5   down, the toilet in the bathroom on the right is not working.
 6   Thank you."
 7              So I have gotten people to address those issues.
 8              So why don't you take the time you need to talk to
 9   Mr. Vasquez, and then I'll come back out so we can get that
10   finalized on the record, and we know we can release the Chief
11   without any problems.
12              MR. WISOTSKY:  Very good.  Actually, while he is doing
13   that, I am going to make a call and get absolute confirmation.
14                        (Off the record)
15              MR. WISOTSKY:  Your Honor, I slightly misspoke because
16   I didn't include one element.  I referenced compensatory damages
17   only, but it was discussed and intended to include any attorney
18   fee award.
19              THE COURT:  Okay.
20              MR. WISOTSKY:  It does include that.
21              I have spoken with the authorities claims manager, and
22   he has again given me approval to enter into such an agreement.
23              THE COURT:  All right.
24              And, Mr. Vogel, have you discussed it with your
25   client?
```

| | |
|---|---|
| 1 | MR. VOGEL:  I have, Your Honor. |
| 2 | THE COURT:  And, Mr. Vasquez, do you understand what |
| 3 | Mr. Vogel explained to you? |
| 4 | THE PLAINTIFF:  Yes, I do. |
| 5 | THE COURT:  Do you have any questions about it that |
| 6 | you need to address with him further? |
| 7 | THE PLAINTIFF:  No. |
| 8 | THE COURT:  Are you willing to abide by the |
| 9 | stipulation that he entered into which basically, from your |
| 10 | perspective, will mean you are giving up any right you might |
| 11 | have to pursue punitive damages and also you will not be |
| 12 | pursuing any *Monell* claim?  Do you know what a *Monell* claim is? |
| 13 | THE PLAINTIFF:  I have an idea. |
| 14 | THE COURT:  Are you willing to go along with that |
| 15 | stipulation? |
| 16 | THE PLAINTIFF:  Yes. |
| 17 | THE COURT:  Anything else we need to do today? |
| 18 | MR. WISOTSKY:  No.  Thank you. |
| 19 | THE COURT:  All right.  So both sides and all the |
| 20 | clients will be available beginning ate 8:00 a.m. tomorrow.  Do |
| 21 | we know where you will be and how to reach you? |
| 22 | MR. HELD:  We will leave cell phones. |
| 23 | MR. VOGEL:  I will leave my cell phone as well.  We |
| 24 | will be in the vicinity of the courthouse. |
| 25 | THE COURT:  No more than 15 minutes away. |

1  MR. WISOTSKY:  Yes.

2  THE COURT:  I'll presumably see you sometime tomorrow.
3  On that subject, if I get another note along the lines of "we
4  need the toilet fixed" or "we need Post-Its" or anything like
5  that, I will just respond to it without notifying you, if that's
6  all right.

7  MR. HELD:  Yes, that's fine.

8  MR. VOGEL:  That's fine with you us.

9  THE COURT:  All right.  Thank you.

10  (Proceedings adjourned at 2:50 p.m.)

11  <u>CERTIFICATE</u>

13  I hereby certify that pursuant to Section 753, Title 18,
United States Code, the foregoing is a true and correct
14  transcript of the stenographically reported proceedings held in
the above-entitled matter and that the transcript page format is
15  in conformance with the regulations of the Judicial Conference
of the United States.

18  /s/ Pamela A. Batalo                    _____
Pamela A. Batalo, CSR No. 3593           Date
Official Reporter