**EXHIBIT D**

The Journal Of The Section Of Litigation     American Bar Association

# Litigation online

Volume 30 No. 2, Winter 2004

# Opening Statement
# The Vanishing Trial

### by Patricia Lee Refo
Chair, Section of Litigation

For permission to reprint, write to Copyright Dept., American Bar Association, 750 N. Lake Shore Drive, Chicago, IL 60611.
Copyright © 2004, American Bar Association. All rights reserved.
http://www.abanet.org/litigation/home.html

Litigation online     http://www.abanet.org/litigation/home.html

# Opening Statement

# The Vanishing Trial

by Patricia Lee Refo

Chair, Section of Litigation

Is the trial an endangered species in our courts? Are the number of trials declining and, if so, why? And should we care?

The Section of Litigation has undertaken a major project to answer these questions under the leadership of the Section's Civil Justice Initiative, chaired by Professors JoAnne Epps of Temple University, Steve Landsman of DePaul University, and Bob Sayler of the University of Virginia. "The Vanishing Trial" project is the largest single initiative the Section has ever funded. We set out to document, and then to analyze, what many of us knew anecdotally from our own practices—that old-fashioned trials are an increasingly rare beast.

First, we turned to Marc Galanter of the University of Wisconsin Law School to collect as much data as possible about what is happening with trials, especially in the federal courts. That data collection formed the predicate for papers by 15 of the most respected academics in the country on a variety of topics relating to the vanishing trial, its causes and consequences. In December 2003, we brought together the academics with state and federal judges and leading practitioners, including ABA President-Elect Robert Grey, for an extraordinary two-day symposium to discuss the data, present the papers and begin to consider the myriad of issues they raise.

To understate, we touched a nerve. The Vanishing Trial project spawned a blizzard of publicity in both the legal and mass media, and has been and will continue to be the subject of follow-on conferences hosted by bar groups across the country. In light of the overwhelming interest this has generated, I will use this column to outline some of the data and findings and share some thoughts from the symposium on why the trial may be vanishing and what it means for our justice system.

## Let's Do the Numbers

In federal courts, the decline in trials has been steep and dramatic. In 1962, there were 5,802 civil trials in the federal courts and 5,097 criminal trials, for a total of 10,899. In 1985, total federal trials had risen to 12,529. By 2002, however, trials had dropped to 4,569 civil trials and 3,574 criminal trials. Thus, *our federal courts actually tried fewer cases in 2002 than they did in 1962,* despite a fivefold increase in the number of civil filings and more than a doubling of the criminal filings over the same time frame. In 1962, 11.5 percent of federal civil cases were disposed of by trial. By 2002, that figure had plummeted to 1.8 percent.

Interestingly, the mix of jury and bench trials has also changed over time. A higher percentage of today's civil trials are before juries, and the number of bench trials has fallen significantly. In 1962, there were slightly more bench than jury trials, but by 2002 two-thirds (65.8 percent) of civil trials were tried to a jury. Total civil jury trials went from 2,765 in 1962, to 3,361 in 1972, to 4,771 in 1982, and then dropped to 4,279 in 1992, down to 3,006 in 2002.

Professor Galanter's groundbreaking research also showed that the types of civil cases being tried have also changed, reflecting, at least in part, the changing nature of the federal civil docket. Trials of tort cases in federal courts have plummeted. In 1962, one in six tort cases went to trial; by 2002, only one in 46 was tried. The percentage of civil trials that involve contract disputes also declined slightly. Meanwhile, trials in civil rights actions went from less than 1 percent of civil trials in 1962 to more than one-third of civil trials in 2002.

Similar trends appear in the cases handled by federal magistrate judges. Magistrate judges tried 570 cases in

The Journal Of The Section Of Litigation · American Bar Association

**Litigation online**

Vol. 30 No. 2, Winter 2004

http://www.abanet.org/litigation/home.html

EDITOR-IN-CHIEF **Jeffrey Cole**
Cole and Staes
Chicago, Illinois

EXECUTIVE EDITOR **Charles D. Tobin**
Holland & Knight LLP
Washington, D.C.

SENIOR EDITORS **Peter D. Baird**
Lewis and Roca
Phoenix, Arizona

**James W. McElhaney**
Case Western Reserve University
School of Law · Cleveland, Ohio

**Jacob A. Stein**
Stein, Mitchell & Mezines
Washington, D.C.

ASSOCIATE EDITORS **Kevin Abel**
Bryan Cave · St. Louis, Missouri

**Robert Aitken**
Law Office of Robert Aitken
Palos Verdes Estates, California

**Arthur H. Aufses III**
Kramer Levin Naftalis & Frankel LLP
New York, New York

**Hon. Elaine E. Bucklo**
U.S. District Court · Chicago, Illinois

**Edna Selan Epstein**
Law Office of Edna Selan Epstein
Chicago, Illinois

**Hon. Robert W. Gettleman**
U.S. District Court · Chicago, Illinois

**Stephen G. Good**
Fletcher & Springer LLP
Dallas, Texas

**Hon. Joseph A. Greenaway, Jr.**
U.S. District Court
Newark, New Jersey

**Howard Gutman**
Williams & Connolly
Washington, D.C.

**Pamela S. Menaker**
Clifford Law Offices
Chicago, Illinois

**Joyce S. Meyers**
Montgomery, McCracken, Walker & Rhoads, LLP
Philadelphia, Pennsylvania

**Lee Stapleton Milford**
Baker & McKenzie
Miami, Florida

**Steven J. Miller**
Goodman Weiss Miller LLP
Cleveland, Ohio

**Jason M. Murray**
Carlton Fields · Miami, Florida

**Michael B. Reuben**
Law Office of Michael B. Reuben
New York, New York

**Maria Rodriguez**
Venable, Baetjer, and Howard LLP
Baltimore, Maryland

**Robert E. Shapiro**
Barack Ferrazzano Kirschbaum Perlman & Nagelberg
Chicago, Illinois

**Laura Lee Stapleton**
Jackson Walker, LLP · Austin, Texas

**Robin Page West**
Cohan & West, P.C.
Baltimore, Maryland

MANAGING EDITOR **Cie Armstead**
American Bar Association

ART DIRECTOR **Liane Sebastian**
MichaelLight Inc.
Evanston, Illinois

1979 (the first year for which data is available), 1,919 in 1996, and only 959 in 2002. As with trials before Article III judges, the number of trials went down while the number of magistrate judges increased significantly. In 1982, one-third of magistrate dispositions were by trial; in 2002, the percentage had dropped to only 7.5 percent.

Of course, the data on federal courts tells only a small part of the story of trials in the United States. The vast majority of trials—an estimated 88,000 in 1999—are in state courts. For a variety of reasons, the data on state court case filings, dispositions, and trials is sketchier. Brian Ostrom and his colleagues at the National Center for State Courts reported on trial trends in state courts from 1976 through 2002. In the 22 states for which data is available, civil jury trials are down by 28 percent and, in 2002, represented 0.6 percent of the total civil dispositions. The rate of bench trials in civil cases has also dropped.

## Why Are Trials Disappearing?

What has caused this dramatic decline in trials? While more work needs to be done on this issue, there is no shortage of theories.

On the criminal side, there was near unanimity that the federal sentencing guidelines are responsible for the decline in the criminal trial. They impose a substantial penalty on a defendant who chooses to exercise his right to a trial—and since they appear to have been designed to encourage or coerce, depending upon your view, defendants to enter into plea agreements, they appear to be working. Fewer defendants today will take the risk that is associated with a trial. It may be no more complex than that.

On the civil side, the causes are more complicated and perhaps more difficult to separate. The explosion in new case filings is certainly at least partly to blame for the vanishing trial. As case filings continue to climb—federal courts disposed of 258,000 civil cases in 2002—judges have to cope with ever-increasing dockets. The sheer time it takes to manage these large caseloads may place such pressure on court resources that there simply isn't the time to try many cases. Or, put differently, judges are placed under enormous pressure to dispose of as many cases as possible. In many jurisdictions, judges are evaluated based on their case disposition rates, an evaluation system that is uniquely hostile to trial dispositions because, by definition, they take longer.

For whatever reason, some judges are simply anti-trial. Judith Resnick of Yale documented judges who view trials as "failures" that occur only when lawyers have not done their job and obtained a negotiated resolution. These judges view themselves as case-resolvers—the faster the better. They have their ways of exacting a toll on those who want to hold out for a jury trial.

We as trial lawyers bear some responsibility because we have made the process of getting to trial too expensive and, relatedly, the trials themselves too long. Discovery is too broad, takes too much time, and costs the parties too much money. The data suggests that the average trial in federal court is longer today than it used to be. When one trial uses more than its fair share of court resources, that leaves fewer resources for the next trial. We can do better—I personally cannot recall a trial I have been in that I thought, in retrospect, was too short. Virtually all of the participants at the symposium were in favor of managing trial resources more carefully. Judges and trial lawyers alike favored the use of a chess clock approach to trials where, after consultation, the court gives each side a fixed amount of time to present its case through both direct and cross-examination. The lawyer is free to allocate his time as he thinks best, but must live within the total limits set by the judge.

Another cause of the declining trial is the rise in summary judg-



ment. Stephen Burbank of the University of Pennsylvania concluded that the rate of case termination by summary judgment rose from approximately 2.8 percent in 1960 to approximately 7.7 percent in 2000. At the same time, however, he cautioned that the rate of summary disposition varies both among different federal courts and among case types. While there is disagreement over whether the Supreme Court's *Celotex* trilogy accelerated the rise in summary dispositions, it seems evident that more, and a higher proportion of, cases are now being resolved under Rule 54 than in prior decades.

Alternative dispute resolution, in all of its permutations, also contributes to the declining trial rates. The trend toward privatization of dispute resolution is well documented, though anything approaching meaningful statistics is hard to come by. Virtually every consumer contract now requires that the consumer waive her rights to adjudicate any dispute in court, and courts have enforced such arbitration clauses. As Thomas Stipanowich of the CPR Institute for Dispute Resolution reminded us, the ADR field is largely unregulated and, by its nature, overwhelmingly private. It is impossible to know how many matters are diverted from the courts to arbitration, but it is surely safe to say that the rise in arbitrations reduces the number of courtroom trials.

Some argue that trials are going away because litigants—particularly corporate litigants—no longer can abide the perceived uncertainty and unpredictability of a jury trial. The demonization of our jury trial system centers largely on tort actions and perceived extremes in verdicts. The certainty of a known result drives litigants to compromise and settle rather than risk the unknown of a jury trial. Some believe the old saw that a bad settlement is better than a good trial.

## The Consequences

As we examine this important issue, we must be cautious, as David Kendall of Williams & Connolly reminded us, not to be nostalgic for something that never was. To be sure, trials have never been our principal method of dispute resolution. It has long been true that most cases settle, or are otherwise resolved, well before the jury is seated in the box. Our examination of the consequences of the vanishing trial must take care not to overstate the role of the jury trial in "the good old days."

Still, the trends are clear enough that we must start asking what the diminishing trial means for our justice system and our society. And what, if anything, the organized bar should be doing about it.

I, for one, am a true believer in the adversary system and the jury trial in particular. The jury trial—with all of its faults—is democracy and self-governance in action. Beyond the passive act of voting, jury service may be the only opportunity most citizens have to participate in any aspect of government. The studies I've seen show that, on average, most jurors work very hard to do the right thing, and leave their jury service feeling good about their experience and about the justice system. In a democratic society, that matters. And the cost of losing that citizen participation in government is impossible to calculate.

The privatization of dispute resolution has a host of consequences. The pleadings, testimony, documents—and the result—are shielded from public view. Indeed, that is one of the reasons litigants turn to private dispute resolution in the first place. Neither the public nor the press has a seat in the private arbitration courtroom. Arbitration decisions contribute nothing to the development of the common law. There is anecdotal evidence that, in some areas, the siren song of private arbitration is affecting the bench because judges, underpaid almost everywhere, can earn so much more by leaving the bench to open their own practice as a "neutral." Moreover, the private judge has none of the protections of an independent judiciary and is therefore subject to pressures from which a judge with life tenure is immune. And in my experience, the private neutrals selected in significant commercial matters do not reflect the same diversity as the judiciary.

There is also something of a chicken and egg issue when it comes to training the trial lawyer. Is it possible that lawyers sometimes settle a case because they don't know how to try one? And if there are fewer trials to go around, then surely over time, fewer lawyers will have meaningful experience in trying a case. When I started practicing, it was expected that before an associate was considered for partner, she have considerable trial experience and hopefully at least one trial as first chair. Now, firms routinely elect new litigation partners who have never even second-chaired a trial. As the diminishing trial practice—as opposed to the litigation practice—is concentrated in fewer seasoned advocates, we are increasingly moving toward a barrister system.

One of the interesting findings of the research is that the vanishing trial has worked a change in the timing of settlements. In the old days when the "threat" of a trial was a potential, settlements often did not happen until the eve of the trial. As fewer cases go to trial and pretrial adjudications take on increasing significance, settlements tend to happen sooner and tend to occur on the eve of an important pretrial event, such as a hearing or ruling on a dispositive motion. To the extent that the earlier settlement saves litigation costs, this change may be a positive side effect.

Finally, as we watch trials diminish, we are reminded by Paul Butler of George Washington University, among others, that there are important and intangible social benefits that flow from the public trial. Trials can be about catharsis and healing. Trials can educate and enlighten. Trials can be a catalyst for change. Trials can bring the light of public scrutiny into what would otherwise be the dark corners of our social landscape. Settlement and compromise can be viewed as just another step toward moral relativism, where there are only shades of grey. Trials are about right and wrong, good and bad, innocence and guilt.

The vanishing trial may be the most important issue facing our civil justice system today. It deserves our continued attention.