# EXHIBIT E

1 BARRETT S. LITT, SBN 45527
E: blitt@littlaw.com
2 LITT, ESTUAR, HARRISON &
KITSON, LLP
3 1055 Wilshire Boulevard, Suite 1880
Los Angeles, California 90017
4 T: (213) 386-3114; F: (213) 380-4585
5

6 CAROL A. SOBEL, SBN 84483
E: carolsobel@aol.com
7 LAW OFFICE OF CAROL A. SOBEL
429 Santa Monica Boulevard, Suite 550
8 Santa Monica, California 90401
T: (310) 393-3055; F: (310) 393-3605
9

10 PAUL L. HOFFMAN, SBN 71244
BENJAMIN SCHONBRUN, SBN
11 118323
JAMES DeSIMONE, SBN 119668
12 E: hoffpaul@aol.com
SCHONBRUN, DE SIMONE, et al.
13 723 Ocean Front Walk
Venice, California 90291
14 T: (310) 396-0731; F: (310) 399-7040
15

On Behalf of all MIWON Counsel
16

17 Attorneys for Plaintiffs

18 UNITED STATES DISTRICT COURT

19 FOR THE CENTRAL DISTRICT OF CALIFORNIA

20

21 MULTI-ETHNIC IMMIGRANT | Case No.: CV 07-3072 AHM (FMMx)
WORKERS ORGANIZING
22 NETWORK, et al. | [Honorable A. Howard Matz]

23 Plaintiffs, | ORDER AWARDING CLASS
| COUNSEL FEES AND COSTS
24 vs. |
25 CITY OF LOS ANGELES, et al., | DATE: June 22, 2009
| TIME: 10:00 A.M.
26 Defendants. | COURTROOM: 14

27

28

1

JUN 24 2009

# I.    INTRODUCTION

This case is a class action on behalf of those whose First and Fourth Amendment rights were alleged to have been violated at the May 1, 2007, protest rally at MacArthur Park. The case was settled on terms spelled out in the Preliminary Approval Order and documents attached thereto, and those terms will not be repeated here.

As a result of the lawsuit, a Consent Judgment will be entered embodying the terms of the settlement. Included in these terms is an order entered by the Court requiring certain guidelines and actions by the LAPD and the City of Los Angeles in its future handling of rallies, demonstrations and marches. Thus, this case definitively altered practices that had been an issue within the LAPD for many years.

This case settled for a total monetary award of $12,850,000, after extensive mediation efforts, to be divided among 297 individual class members represented individually by various MIWON or other counsel, and a residual class fund. From this, the Court was to be requested to award $3,455,000 plus $258,000 in medical liens and litigation costs, for a total of $3,713,000, to MIWON Counsel (as well as to approve the arrangement under which the non-MIWON counsel received approximately $500,000 in statutory fees negotiated between them and MIWON Counsel, as part of the division of the settlement.)

Plaintiffs filed a motion for attorneys' fees seeking the foregoing agreed to fees and costs, based on both a class fund theory and a lodestar theory. For the reasons stated below, the Court awards Plaintiffs' counsel $3,713,000 in attorneys' fees and costs.

Defendants did not object to, or challenge, Class Counsel's request for fees and costs.

## II. THE STANDARDS FOR AWARDING CLASS FUND ATTORNEYS' FEES.

It is well settled in the Ninth Circuit that, "[i]n a common fund case, the district court has discretion to apply either the lodestar method or the percentage-of-the-fund method in calculating a fee award." *Fischel v. Equitable Life Assurance Soc'y of the U.S.,* 307 F.3d 997, 1006 (9th Cir.2002). "Reasonableness is the goal." *Id.* at 1007.

The Court will analyze the requested fees under both the percentage of the fund and the lodestar tests.

## III. THE REQUESTED FEE IS REASONABLE UNDER THE PERCENTAGE OF THE FUND TEST.

Although not mandated by the Ninth Circuit, courts often consider the following factors when determining the benchmark percentage to be applied: (1) the result obtained for the class; (2) the effort expended by counsel; (3) counsel's experience; (4) counsel's skill; (5) the complexity of the issues; (6) the risks of non-payment assumed by counsel; (7) the reaction of the class; and (8) comparison with counsel's loadstar. *See, e.g., In re Heritage Bond Litigation,* 2005 WL 1594403 at 18*; In re Quintus Sec. Litig.,* 148 F.Supp.2d 967, 973-74 (N.D.Cal.2001). The Court will address each factor below.

In this case, the Court finds that most of the factors enunciated above exists in this case.

### A. *THE COMPLEXITY OF THE ISSUES, COUNSEL'S SKILL AND EXPERIENCE, AND THE EFFORT INVOLVED.*

Congress recognized the complexity of civil rights cases when the civil rights attorneys' fee statute (42 U.S.C. §1988) was passed in 1976. The legislative history states, "It is intended that the amount of fees awarded under S. 2278 (42 U.S.C. §1988) be governed by the same standards which prevail in other types of equally complex federal litigation, such as antitrust cases and not be reduced

3

1   because the rights involved may be nonpecuniary in nature." S.Rep.No. 94-1011,

2   1976 U.S.Code Cong. & Admin.News at 5913.

3       While the legal issues in this case are not particularly novel, the factual

4   issues were complex, and management of the process required a high level of skill

5   and effort. Because this was a hybrid individual and class case, Plaintiffs' counsel

6   and their staffs represented nearly 300 individuals. Defendants insisted that, in

7   order to settle the case, they needed independent verification (video, photos, third

8   party witnesses, medical reports) for the vast majority of the Represented

9   Individuals, even though the case was a class action.

10      Counsel litigated this case aggressively. The work performed included: 1)

11  extensive investigation of the underlying circumstances, including interviewing

12  each of the approximately 300 Represented Individuals at length, and many

13  witnesses as well; 2) reviewing LAPD reports and investigations, as well as

14  hundreds of hours of videos to locate photos of Represented Individuals; 3)

15  preparation of the complaint; 4) the Rule 26 conference and report; 5) obtaining the

16  medical records for the Represented Individuals; 6) preparing mediation write-ups

17  regarding the specifics of each Represented Individual, and then preparing a

18  mediation package with photographic and video evidence to support each of the

19  300 individual claims of presence in the park, and injury; 7) filing the class

20  certification motion and related papers; 8) engaging counsel for all the Represented

21  Individuals in a common process of valuing cases, after MIWON Counsel

22  established and refined a system for assessing the cases, as a result of which all

23  counsel in all case agreed to the approach; 9) preparing lengthy mediation papers;

24  10) attending six mediation sessions; 11) working out a series of individual

25  problem cases, with the participation of Class Counsel, the individual counsel

26  representing the client, and Judge Woehrle; and 12) preparing and negotiating the

27  settlement documents with the defendants.

28

4

Class Counsel have represented that the monetary terms of the settlement represent, to their knowledge, the largest total settlement in the country for a demonstration case, and the largest average per person damages recovery in any mass demonstration case to date. In addition, the settlement encompasses comprehensive structural relief.

The appointed MIWON Class Counsel – Barry Litt, Carol Sobel and Paul Hoffman – are highly skilled civil rights and civil rights class action litigators. Each has outstanding reputations as exceptional civil right attorneys.

### B. THE RISKS OF NON-PAYMENT ASSUMED BY COUNSEL

While there may not have been a great risk of lack of proof of liability in the case, , there was substantial risk that the cost of litigating it could outstrip the damages in the case, particularly if the Class were not certified. Those risks included: 1) a potentially very difficult discovery process, requiring thousands of additional hours for the case; 2) a requirement (asserted by the City at the class certification hearing) that Plaintiffs prove lack of probable cause on an individual basis; 3) in the current economic climate, the risks of non or delayed payment are substantial (a form of which has occurred in that payment is delayed until sale of a judgment bond to fund the settlement).

Other risks included class certification, settling the case expeditiously, managing the factual complexities of the case effectively, receiving an adequate fee award commensurate with the work involved, the disproportionate responsibility of the MIWON counsel to carry the case.

While risk is normally tied to the right to receive a multiplier above the ordinary hourly rate to compensate for contingent risk, in this case, the opposite is true, i.e., counsel seek an award that actually represents a discount from lodestar, as is discussed in the lodestar section.

**C.    THE RESULT OBTAINED FOR THE CLASS AND THE CLASS' REACTION.**

As discussed, this settlement represents the largest financial settlement of a demonstration case Class Counsel know of, with a residual class fund. In addition, in the past, the LAPD had privately agreed to changes, but had not implemented those agreements. The current settlement incorporates a Consent Judgment under which the City and the LAPD agree to a series of policies and procedures, as well as the continued jurisdiction of the Court to enforce the Consent Judgment as part of the Court's order approving the final settlement.

There was only one objection to the settlement itself or to the award of attorney's fees, and there were no opt-outs. This is a highly favorable reaction by the class to the settlement. *Compare, e.g., Hughes v. Microsoft Corp.,* 2001 WL 34089697, 8 (W.D.Wash. 2001) (court found that the "class members overwhelmingly support[ed] the settlement" where there were over 37,000 notices sent out, 2,745 class members participated in the settlement, "only nine objections were submitted", and there were 86 timely opt-outs and over 20 additional defective or untimely opt-outs; "these indicia of the approval of the class of the terms of the settlement support a finding of fairness under Rule 23"), citing *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1027 (9th Cir.1998) (despite vigorous objections and appeal by objectors, "fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness"; court did not abuse its discretion in approving settlement); *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173, 1178 (9th Cir.1977) (approximately 1% of 31,000 class members opted out; "the fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness").

**D.    THIRTY-ONE PERCENT IS A REASONABLE CLASS FUND AWARD IN THIS CASE.**

6

1   Where the percentage of the fund award is employed, the Ninth Circuit has
2   "established 25% of the common fund as the 'benchmark' award for attorney
3   fees." *E.g., Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1376 (9th Cir.1993).
4   Although 25% is the benchmark, the Ninth Circuit has recognized that a variety of
5   factors may lead to an upward adjustment of the percentage. *E.g., In re Pac. Enter.*
6   *Sec. Litig.,* 47 F.3d 373, 379 (9th Cir.1995) (district court "may adjust the
7   benchmark when special circumstances indicate a higher or lower percentage
8   would be indicated"). The percentage amount can be adjusted upward or
9   downward, or replaced by a lodestar calculation, to account for any unusual
10  circumstances involved in the case, which, for example, would indicate that the
11  percentage recovery would be either too small or too large in light of the hours
12  devoted to the case. *Six Mexican Workers v. Arizona Citrus Growers,* 904 F.2d
13  1301, 1311 (9th Cir.1990). When making an adjustment, the district court should
14  identify "how it arrives at the figure ultimately awarded." *Paul, Johnson, Alston &*
15  *Hunt v. Graulty,* 886 F.2d 268, 272 (9th Cir. 1989); see also *Six Mexican Workers,*
16  *supra.*

17      Nationally, the average percentage of the fund award in class actions is
18  approximately one-third. The Federal Judicial Center published a report in 1996,
19  entitled "Empirical Study of Class Actions in Four Federal District Courts: Final
20  Report to the Advisory Committee on Civil Rules" ("FJC Report"). The study is
21  based on 407 class action lawsuits that either settled or went to verdict in the two
22  year period from July 1, 1992, through June 30, 1994, in four federal district
23  courts: the Eastern District of Pennsylvania (Philadelphia); the Southern District of
24  Florida (Miami), the Northern District of Illinois (Chicago); and the Northern
25  District of California (San Francisco). (FJC Report, pp. 3-4, 7-8.) The Empirical
26  Study found that "the fee-recovery rate infrequently exceeded the traditional 33.3%
27  contingency fee rate. Median rates ranged from 27% to 30%. Most fee awards in

28

7

the study were between 20% and 40% of gross monetary settlement." (*Id.* at pp. 68-69; citation and footnote omitted.). The Report concluded that "attorneys' fees were generally in the traditional range of approximately one-third of the total settlement." (*Id.* at p. 90.)

Another study, cited by Silber and Goodrich, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response*, 17 RevLitig 525, 534 (1998), was done by National Economic Research Associates, an economics consulting firm, in 1994. It found that attorneys' fees in class actions averaged approximately 32% of the recovery, regardless of the case size, and averaged 34.74% when the fees and expenses were added together. Silber and Goodrich, *supra* at 545-546. Silber and Goodrich conclude with the observation that a 33% fee award is both reasonable, and in line with the general market for contingent fee work. *Id.* at 546-549. This is the general percentage that they recommend. *See also In re Rite Aid Corp. Securities Litigation*, 396 F.3d 294, 303 (3rd Cir. 2005), citing three studies ("[O]ne study of securities class action settlements over $10 million ... found an average percentage fee recovery of 31%; a second study by the Federal Judicial Center of all class actions resolved or settled over a four-year period ... found a median percentage recovery range of 27-30%; and a third study of class action settlements between $100 million and $200 million ... found recoveries in the 25-30% range were 'fairly standard.'") (citations omitted).

In this case, based on a fee of $3,955,000 (the requested MIWON statutory fees plus the non-MIWON statutory fees), Plaintiffs would receive, as a percentage of the fund, a 31% award. This is well within the reasonable range of percentage of the fund awards, just at what most studies and commentators have characterized as the median nationally.

The Ninth Circuit has recognized that many cases result in a higher percentage than the benchmark. See, e.g., *Vizcaino v. Microsoft Corp.,* 290 F3d

8

1043 (9th Cir. 2002) (affirming a 28% award, resulting in a multiplier for Plaintiffs' counsel of 3.65, based on 1) an exceptional result, 2) litigation risk, 3) benefits generated beyond the cash settlement, 4) the 28% figure was at or below market rate, and 5) the lengthy time period of the litigation and foregoing other work). Most , if not all of these factors are present here, but the biggest difference is that there is no multiplier above lodestar, but a discount, a factor favoring an upward adjustment.

In addition, because there was a statutory attorney's fee available, it was an independent factor in the settlement negotiations and significantly increased the recovery. The settlement agreement, ¶24, states that "Plaintiffs' potential claim for statutory attorney's fees was a substantial factor in arriving upon the final settlement amount of $12,850,000" and that "the statutory attorney's fee claim materially and substantially increased the final settlement amount from what it otherwise would have been." In such a situation, and where the lodestar exceeds the benchmark percentage of the fund amount, it is appropriate to consider the lodestar in determining a reasonable upward adjustment of a percentage fee award. Various factors support this conclusion, including that 1) the amount requested was factored in by Class Counsel in determining the reasonableness of the settlement; 2) the MIWON Plaintiffs agreed to post-fee amounts, i.e., the amount they would actually receive, and the award requested here does not affect any of those amounts; and 3) the MIWON Counsel – in contrast to the non-MIWON counsel – waived their right to any percentage of the recovery beyond what the Court awarded with any of their individual clients.

## IV. THE REQUESTED FEE IS REASONABLE UNDER THE LODESTAR TEST.

### A. *LODESTAR STANDARDS.*

Lodestar is defined generally as the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Hensley v. Eckerhart*, 461

U.S. 424, 433 (1983). Where a plaintiff has obtained excellent results, his or her attorney should recover a fully compensatory fee. *See Hensley, supra,* 461 U.S. at 435. Full compensation normally encompasses all hours reasonably expended on the litigation. *Id.*

In *Blum v. Stenson*, 465 U.S. 886, 895, n.11 (1984), the United States Supreme Court explained that "'reasonable fees' … are to be calculated according to the prevailing market rates in the relevant community." The Court should pay "close attention" to "the fees charged by 'lawyers of reasonably comparable skill, experience and reputation.' " *Davis v. City and County of San Francisco*, 976 F.2d 1536, 1545-1546 (9th Cir. 1992). Subsequently, in *City of Riverside v. Rivera*, 477 U.S. 561, 575-576 (1986), the Supreme Court elaborated that rates for civil rights litigation should be based on the market for complex federal litigation, citing Congress intent in enacting Section 1988 that it "intended that the amount of fees awarded under [§1988] [sic] be governed by the same standards which prevail in other types of equally complex Federal litigation, such as antitrust cases."

## B. THE REQUESTED RATES ARE REASONABLE

Exhibit "J" to Plaintiffs' Motion for Attorney's Fees is a summary chart of the number of hours expended by each person being billed as well as detail of time billed. For the attorneys involved, the chart includes their year of law school graduation. The chart below provides, in order of hours worked, the graduation year, hourly rate, hours and totals for the six MIWON attorneys who were most active in the litigation (which represents over 50% of the total bill).

| NAME | GRADUATED | HOURS | RATE | TOTAL |
|---|---|---|---|---|
| Carol Sobel | 1978 | 867.3 | $710 | $624,456.00 |
| Barry Litt | 1969 | 668.1 | $800 | $534,480.00 |
| Robert Myers | 1975 | 522.1 | $710 | $362,859.50 |
| Cynthia Anderson-Barker | 1994 | 497.2 | $490 | $236,170.00 |
| Rebecca Thornton | 2001 | 465.3 | $425 | $181,467.00 |

| NAME | GRADUATED | HOURS | RATE | TOTAL |
|------|-----------|-------|------|-------|
| Paul Hoffman | 1976 | 307.3 | $750 | $230,475.00 |
| | | | | $2,169,907.50 |

The rates used here are reasonable and are supported by abundant evidence demonstrating that attorneys of lesser years handling complex litigation have comparable or higher billing rates, and that several courts have awarded comparable rates to these and other counsel. The Court finds that the rates requested by the MIWON counsel are reasonable.

### C. THE HOURS EXPENDED ARE REASONABLE

While the hours expended by MIWON Counsel are substantial, they are not unexpected in light of the character of the case. MIWON Counsel represented nearly 200 individuals, and there was a total of 297 Represented Individuals, including those represented by non-MIWON counsel. MIWON counsel took the lead on all fronts of the case.

MIWON Counsel assigned each attorney or law firm a group of clients for which they were responsible. The interaction with that client throughout the case, the documentation, client assessment, medical workups where needed, and written summary were the responsibility of that attorney. A handful of full client meetings were held, in which all the MIWON clients and Counsel were invited to participate. In those meetings, there were presentations on general questions applicable to all clients (e.g., how a class action works, mediation plans, and the like), discussions of the progress of the case and the Police Department investigation of complaints, with a time set at the end of each meeting for the larger group of clients to break into the smaller assigned groups to meet with the individual attorneys assigned to each group of clients. This was a reasonable means of communication with clients, and an effective means of investing them in the

11

case as a whole – a necessity for a case that, at best would take two to three years and, if it did not settle, far longer.

MIWON Counsel worked with the non-MIWON counsel to agree to a common approach to settlement, reviewed the write-up for each non-MIWON Plaintiff, recommending changes, conforming its format, evaluating the individual rating and damages for that individual, and then meeting with each of the non-MIWON counsel so as to ensure uniformity. This occurred with the non-MIWON counsel after the same process had been completed for the MIWON counsel. In addition, MIWON Counsel prepared all the pleadings and early discovery, all the negotiations with the City and Judge Woehrle (in some of which some of the non-MIWON counsel participated), all of the negotiations to reach the structural relief agreement, and the vast majority of the review of the demonstration documentation to locate participants and respond in concrete form to the City's requirement that Plaintiffs provide some form of verification of their presence in MacArthur Park at the date and time of the police action..

In order to ensure uniformity of each case assessment – essential if a settlement were to be reached – MIWON Counsel established a committee of several MIWON Counsel responsible to evaluate every case uniformly – both those represented by MIWON and non-MIWON counsel. They developed a uniform scoring system; reviewed each Plaintiff, his/her facts, documentation and medical records; and scored the Plaintiff.

MIWON counsel met with the non-MIWON counsel primarily responsible for the particular client, and used the same methodology used for the MIWON clients to come to an agreement about the valuation of their clients' claims. They reviewed all the documents for the non-MIWON as well as the MIWON clients. Further, MIWON Counsel participated directly in meeting with reluctant clients of other counsel – generally in conjunction with Judge Woehrle – to work out ways of

12

1   resolving this issue so that it would not stymie the settlement process. Dozens of
2   hours were spent by MIWON Counsel in just this effort.

3          All settlement documents were prepared by MIWON Counsel and the City.
4          It was generally acknowledged by all counsel that the MIWON Counsel
5   were the driving force in resolving the settlement. MIWON Counsel ultimately
6   negotiated with each set of non-MIWON attorneys the recovery, including
7   statutory fees, that would be assigned each attorney and his/her clients.

8          Analyzed on a per client basis, with approximately 300 clients – since the
9   MIWON Counsel were effectively co-representing the non-MIWON clients – and
10  9600 hours, it means that 32 hours were expended per client. The mean recovery
11  was over $25,000. Attorney's fees of $4,000,000 prorated (including the statutory
12  fees paid to non-MIWON counsel) prorated among 297 clients comes to slightly
13  more than $13,000 per client. This is reasonable for a case that involved litigation,
14  informal discovery, extensive mediation, and a class process.

15         Accordingly, the Court finds that the hours expended in this case were
16  reasonable. The Court also notes that the actual hours being compensated, based on
17  the approved hourly rates, amounts to a 13%-14% discount from lodestar (the
18  difference between a $4,000,000 lodestar based on the approved rates and hours
19  and factoring in a modest amount of further work) and the $3,455,000 requested as
20  MIWON fees.

21         Accordingly, whether using the lodestar or the percentage of the fund
22  method, the fee requested is reasonable.

23  **V.    ALLOCATION OF LIEN REDUCTIONS.**

24         The Court has been advised that MIWON counsel has successfully
25  negotiated some liens and expects to reduce the size of the MIWON liens
26  somewhere between $50,000 and $100,000. These lien funds are part of the total
27  $3,753,000 requested by MWION counsel. MIWON counsel have further advised

28

1 | the Court that, under their arrangements with their clients, each client is to receive
2 | a specified amount, and counsel assumed responsibility for the liens. The Court has
3 | also been advised by MIWON counsel that, probably as a result of the larger than
4 | expected Unrepresented Class Member claims, there is a bill of $30,617.80 to
5 | cover the Class Administrator's billing to date, and the Class Administrator
6 | estimates an additional $11,315 and possibly more to complete the claims
7 | administration (excluding particular efforts that may be requested by the City at its
8 | expense). This bill is greater than had originally been expected. Originally,
9 | $50,000 in class administrative costs was anticipated, including payment of
10 | $20,000 to Plaintiff organizations for outreach to Unrepresented Class Members.
11 | Based on the currently anticipated Class Administrator bills, the costs of class
12 | administration will be approximately $12,000 more than anticipated.

13 |        In light of the fact that the amount to be paid to MIWQN counsel is less than
14 | their lodestar, the Court approves that any sums saved by the reduction of liens
15 | shall be deemed fees to the MIWON counsel. However, from that reduction,
16 | MIWON counsel shall pay the additional class administrative costs so that the
17 | funds available for distribution to Unrepresented Class Members remains
18 | $200,000.

19 | **VI.    THE REQUESTED COSTS ARE REASONABLE.**

20 |        Plaintiffs seek an award of $258,000 in costs, most of which are for medical
21 | liens yet to be paid. To the extent they are not, MIWON Counsel submitted an
22 | itemization of costs, which the Court finds reasonable. Accordingly, those costs are
23 | awarded as well.

24 |
25 | DATED:  _June 24, 2009_        _____
26 |                        UNITED STATES DISTRICT JUDGE
27 |
28 |

14

1

2    Submitted by:

3    LITT, ESTUAR, HARRISON & KITSON, LLP

4    LAW OFFICES OF CAROL SOBEL

5

6

7    By :    _/s/  Barrett S. Litt_____
             BARRETT S. LITT
8            Attorneys for Plaintiff Class

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28